72 U.S. 481 (____)
5 Wall. 481
THE EDDY.
Supreme Court of United States.

*488 Mr. Carlisle, for the appellants.
*490 Mr. Justice CLIFFORD delivered the opinion of the court.
Substance of the allegations of the libel setting forth the cause of action was, that certain merchants at New Orleans, on the 25th day of March, 1854, shipped on board the schooner Mary Eddy, then lying in that port, one hundred and two hogsheads of sugars, for which the master gave a bill of lading to the shippers, and that he contracted to transport the sugars from that port to the port of Charleston, and there to deliver the same to the appellants, in good order and condition, saving and excepting only the dangers and accidents of the seas and navigation; and the libellants averred that the vessel departed on the voyage, and that the master had neglected and refused to deliver the sugars.
Answer of the respondents admitted the reception of the sugars, the contract of affreightment as set forth in the bill of lading, and the arrival of the schooner at the port of destination with the sugars on board, in good order and condition.
Principal defence set up in the answer was that the contract to deliver the sugars was subject to the lien of the respondents for the payment of the freight, as stipulated in the bill of lading; and they averred that the vessel proceeded on her voyage, and arrived safely at the port of destination with the sugars on board, in good order and condition, and that the master gave immediate notice of those facts to the consignees, *491 and offered to deliver the sugars to them, according to the bill of lading, but they utterly neglected and refused to pay the freight.
First appeal of the libellants to this court was dismissed, it appearing that neither this court nor the Circuit Court had jurisdiction of the case, as no final decree had been entered in the District Court where the libel was filed.[*] Such being the fact, this court dismissed the appeal, and remanded the cause to the District Court, in the same condition in which it was before the appeal was taken to the Circuit Court, in order that the District Court might proceed with the case to a final decree. Pursuant to the mandate of this court, the District Court completed the hearing, and still being of the opinion that the claim of the libellants was well founded, entered a final decree in their favor; but the Circuit Court reversed the decree, on the appeal of the respondents, and the libellants appealed to this court.
1. The record shows that the controversy in this case, in its origin, grew out of a difference of opinion between the parties as to the respective rights and duties of the master of the schooner, as a carrier by water, and the shipper of the cargo, in respect to the delivery of the goods, or rather of the shipowners and the consignees and owners of the cargo, under the usual bill of lading stipulating for the delivery of the goods upon payment of the freight. Appellants, as the consignees and owners of the cargo, conceded that the owners of the schooner had a lien for the freight, but insisted that they, as consignees and owners of the cargo, had a right to inspect the sugars before paying the freight, as stipulated in the bill of lading, and that it was the duty of the master, under the usages of the port, to discharge the entire consignment before exacting the payment of freight, and to allow them, as the consignees, to take possession of the sugars, and transport the same to their store, in order that they might be enabled satisfactorily to make such examination and inspection.
*492 Acting for the owners of the vessel, the master admitted that it was his duty to discharge the entire consignment, and to permit the same to be inspected by the consignees, but he denied that it was his duty to allow the sugars to be transported to the warehouse of the consignees until the freight was paid. On the contrary, he insisted that it was his right to retain possession of the sugars as the means of preserving the lien of the vessel, to which the sugars were subject for the payment of the freight. When the agent of the libellants first went to the vessel, shortly after her arrival, and asked for the sugars, he was duly notified by the master that the lien of the vessel for the payment of the freight would not be waived. Subsequently, one of the libellants went on board and had some conversation with the master in respect to the payment of the freight and the delivery of the consignment. They came to an understanding that all the sugars which were in good order should be sent to the store of the libellants, but that the freight on all so sent should be paid on the wharf.
The whole consignment consisted of one hundred and two hogsheads of sugars and twenty-one barrels of syrup. Libellants' clerk sent the twenty-one barrels of syrup and three hogsheads of the sugar to their store, under that arrangement, but the libellants refused to furnish the money to pay the freight, and the master declined to permit any more to be sent, except upon payment of the freight, as it had been understood in that arrangement. Finding that they were unable to agree, the master notified the libellants that he should exact the payment of freight on the wharf; and they, in reply, notified the master that they should hold him responsible for any injury the sugars should receive on the wharf. Correspondence took place between the parties in respect to the delivery of the sugars and the payment of the freight, which is exhibited in the record, together with the testimony of various witnesses who were examined upon the subject.
The vessel arrived at Charleston on the last day of March, 1854, and the cargo was discharged on the third and fourth *493 days of April following. Notice was given to the libellants early in the afternoon of the latter day, to the effect that the consignment was ready to be delivered in good order and condition, on payment of freight, but that if they refused to pay freight, as stipulated in the bill of lading, the sugars would remain on the wharf until sunset, and would then be stored at their expense and risk. Their response was that they would give security for the freight to be paid, in accordance with the usages of the port, upon the delivery of the consignment. They also objected to the notice as too late in the day to enable them to transport the sugars from the wharf and store them in their warehouse.
Throughout the correspondence it is obvious that the libellants denied all obligation to pay the freight until the entire consignment was discharged and delivered without qualification, so that they could store the goods and inspect them in their own warehouse. Refusing to accede to those terms the master discharged the sugars, and after waiting a reasonable time stored them, and notified the libellants that they were stored at their risk and cost, to be delivered to them upon payment of freight and charges. Proofs also show that the libellants examined the sugars the next day  both those on the wharf and those in store  but no demand was made nor was any freight tendered.
2. Undoubtedly the shipowner has a lien upon the cargo for the freight, and consequently may retain the goods after the arrival of the ship at the port of destination until the payment is made, unless there is some stipulation in the charter-party or bill of lading inconsistent with such right of retention and which displaces the lien.[*] Text-writers usually state the rule as follows: Le batel est obligé à la marchandise et la marchandise au batel.[]
Unquestionably the general rule of law is well expressed in that maxim, but it is subject to an important exception *494 as applied to the cargo, that the lien may be displaced by an inconsistent and irreconcilable provision in the charter-party or bill of lading, making it the duty of the master to deliver the goods unconditionally before the consignee is required to pay the freight. Saving that exception, the rule is universal that the ship and freight are bound to the merchandise and the merchandise to the ship. Shipowner contracts for the safe custody, due transport, and right delivery of the merchandise, and the shipper, consignee, or owner of the cargo contracts to pay the freight and charges. These are reciprocal duties, and the law creates reciprocal liens for their enforcement, but the lien of the shipowner may be displaced, as before explained, or it may be waived.
Such a lien  that is, the lien of the shipowner  is not "the privileged claim" of the civil law, but it arises merely from the right of the shipowner to retain the possession of the goods until the freight is paid, and therefore it is lost by an unconditional delivery of the goods to the consignee. Subject to this explanation, the maxim that the ship is bound to the merchandise and the merchandise to the ship for the performance of all the obligations created by the contract of affreightment, is the settled rule in all the Federal courts.[*]
3. Contracts of affreightment, notwithstanding it is held that the lien of the shipowner is nothing more than the right to withhold the goods, and is inseparably associated with his possession, are regarded by the courts of the United States as maritime contracts over which the courts of admiralty have jurisdiction, and consequently that either party in a proper case may enforce his lien by a proceeding in rem in the District Court. Where the ship is in fault, the usual remedy of the consignee is by the proceeding in rem; but where the shipper, owner, or consignee of the cargo is in fault, the shipowner usually finds an adequate remedy by retaining the goods until the freight and charges are paid. His right to do so is beyond doubt, but he cannot detain the goods on board the ship until the freight is paid, as the consignee *495 or owner of the cargo would then have no opportunity of examining their condition. Practice in England is to send such goods as are not required to be landed at any particular dock to a public wharf, and order the wharfinger not to part with them till the freight and other charges are paid; and it is held that in such cases the lien of the master continues, as the goods remain in his constructive possession.[*]
4. Delivery on the wharf in the case of goods transported by ships is sufficient under our law, if due notice be given to the consignees and the different consignments be properly separated, so as to be open to inspection and conveniently accessible to their respective owners.[] Where the contract is to carry by water from port to port an actual delivery of the goods into the possession of the owner or consignee, or at his warehouse, is not required in order to discharge the carrier from his liability. He may deliver them on the wharf; but to constitute a valid delivery there the master should give due and reasonable notice to the consignee, so as to afford him a fair opportunity to remove the goods, or put them under proper care and custody. When the goods, after being so discharged and the different consignments properly separated, are not accepted by the consignee or owner of the cargo, the carrier should not leave them exposed on the wharf, but should store them in a place of safety, notifying the consignee or owner that they are so stored, subject to the lien of the ship for the freight and charges, and when he has done so he is no longer liable on his contract of affreightment.[]
5. Parties may agree that the goods shall be deposited in the warehouse of the consignee or owner, and that the *496 transfer and deposit shall not be regarded as a waiver of the lien, and where they so agree the courts of admiralty will uphold the agreement and support the lien; but there was no agreement in this case. The appellants refused to pay the freight, and the master declined to part with the possession of the goods. He discharged the cargo upon the wharf, gave due notice to the consignees, and they refused to pay the freight, claiming that they had a right, by the usages of the port, to remove the goods to their store for inspection, without paying freight. They examined witnesses upon that subject, but it is sufficient to say that they failed to prove any such usage. Relying on proof of such a usage, they refused to accept the goods, and the master stored them in a place of safety and gave due notice to the libellants.
6. Misinterpreting the mandate of this court, the district judge came to the conclusion that the interlocutory decree entered in the cause before the former appeal could be supported by proof of the subsequent misconduct of the bailee of the goods, who sold certain portions of them to pay the charges for storage. All we think it necessary to say upon the subject is that none of those questions are involved in the pleadings in this record. Present libel was in rem against the vessel for the non-delivery of the consignment of the libellants. Respondents appeared and set up the defence that the goods were subject to the lien of the vessel for the freight, and that the libellants, without just cause or excuse, refused to pay the freight, and they fully proved their defence. Having proved their defence, they were entitled to a decree in their favor, wholly irrespective of any subsequent misconduct of the bailee of the goods, who was not before the court.
The decree of the Circuit Court is therefore
AFFIRMED WITH COSTS.
NOTES
[*] Mordecai et al. v. Lindsay et al., 19 Howard, 199.
[*] Bags of Linseed, 1 Black, 112.
[] Cleirac, p. 597; Abbott on Shipping, 8th ed., p. 248; Maude & Pollock on Shipping, 254.
[*] Dupont v. Vance, 19 Howard, 168.
[*] Chitty & Temple on Carriers, 222; Ward v. Felton, 1 East, 512; Machlachlan on Shipping, 369.
[] 2 Parson on Contracts, 5th ed. 195; Ship Middlesex, 21 Law Rep. 14.
[] Richardson et al. v. Goddard et al., 23 Howard, 39; 1 Parson's Maritime Law, 153; Machlachlan on Shipping, 367; Hyde v. T. & M. Nav. Co., 5 Term, 389; 2 Parsons on Contracts, 5th ed. 191; Brittan v. Barnaby, 21 Howard, 532.