## NORTH AMERICAN SMELTING CO. v. MOLLER S. S. CO., Inc.

### No. 10949.

United States Court of Appeals
Third Circuit.

Argued April 9, 1953.

Decided May 11, 1953.

Rehearing Denied May 29, 1953.

McLaughlin, Circuit Judge, dissented.

Thomas E. Byrne, Jr., Philadelphia, Pa. (Krusen, Evans & Shaw, John B. Shaw, T. J. Mahoney, Jr., Philadelphia, Pa., on the brief), for appellant.

James S. Benn, Jr., Philadelphia, Pa. (Hill, Rivkins, Middleton, Louis and Warburton, Barton P. Ferris, New York City, on the brief), for appellee.

Before MARIS, GOODRICH and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

This is an action brought to recover for the loss of certain goods shipped from the Philippine Islands to Philadelphia. The goods were shipped on the "Johannes Maersk" and arrived in Philadelphia on Saturday, March 27, 1948. The shipment, which was consigned to the North American Smelting Company, libellant here, consisted of 187 pieces as follows:

58 full drums heavy yellow brass scrap
45 half drums heavy scrap soft lead
54 full drums heavy copper and wire
21 bundles heavy copper and wire
9 rolls heavy copper and wire

The total weight of this shipment was 157,795 lbs. or an average weight per piece of 843 lbs. The vessel began unloading at 8:00 A.M. on March 29, 1948. On that same day an arrival notice was mailed to the consignee. The notice accurately gave the place of the discharge of the cargo. The goods consigned to North American were discharged onto Pier 98, in the Port of Philadelphia, on March 29th.[1]

On Friday, April 2nd, a portion of the shipment was removed. This consisted of 40 drums of the scrap brass, 36 drums of the copper, and 27 half drums of lead. To complete removal on Friday the libellant would have been compelled to pay overtime to the steamship company's delivery clerk and checker. Work was suspended at 5:00 P.M. on Friday, April 2nd. On Monday, April 5th, a check revealed that a portion of the shipment was missing. This portion consisted of 1 drum of heavy yellow brass scrap, 1 drum of heavy copper and wire scrap, 6 bundles of heavy copper and wire scrap, and 3 rolls of heavy copper and wire scrap. The question in this case is whether the steamship company must pay for this loss.[2]

By the terms of the Bill of Lading under which these goods were shipped it is stipulated that failure to notify consignee "shall not involve Carrier or Agents in any responsibility * * *"[3] The bill of lad-

1. The brief filed on behalf of the libellant suggests that proof was insufficient to establish the discharge of all the goods consigned to North American. The district court, however, made a specific finding that the goods were discharged from the ship to the pier. We have examined the testimony supporting the finding and agree with the finding made by the trial judge.

2. The Appellant raises the question whether this suit is cognizable in admiralty although he does not press the point very hard. We think it is. Ex parte Easton, 1877, 95 U.S. 68, 24 L.Ed. 373; The Eddy, 1866, 5 Wall. 481, 72 U.S. 481, 18 L. Ed. 486.

3. The court was advised that this is a common form of bill of lading in shipments from foreign countries but there is no evidence or finding to that effect.

ing contains the further stipulation: "* * And it is expressly understood that the articles named in this Bill of Lading shall be at the risk of the Goods' Owner, Shipper, or Consignee thereof as soon as delivered from the tackle and/or deck of such steamer at her port of discharge * * * if not taken away the same day they may * * * be * * * permitted to lie where landed at the expense and risk of the goods * * *."

If the provisions of the bill are to be applied literally the case quite clearly comes to an end forthwith and in favor of the carrier. It did place the goods on the pier. But at the argument the steamship company's counsel admitted that such a happy solution, from his standpoint, was too good to be true. This admission was well made in view of the language of the Harter Act.[4] We were given reference to the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. But whatever that Act does we do not think it touches the question in this case, and appellant's counsel, upon careful examination of his argument, does not think so either.

■ There is no doubt that in discharging the cargo onto the pier and notifying the consignee the carrier was no longer in possession of the goods so as to suffer the risk of loss not due to any negligence on its part.[5] During the course of the removal of the shipment from the pier the consignee's employee gave a receipt for the items taken away on his truck to the agent of the steamship company. We do not think, however, that this showed that the carrier was still in possession of the goods and responsible for them. We regard the receipt rather as a matter of orderly bookkeeping procedure having no significance on the question of whether the carrier had fulfilled its duty to the consignee.

■ We think the real and only issue in this case gets down to the question whether the appellee exercised reasonable care in placing the goods on the pier, notifying the consignee and then, after a portion of the goods had been removed, leaving them without a guard until they were finally taken away in a truck furnished by the consignee. This issue was somewhat confused, we think, by references to the so-called five-days free time rule which prevails on this pier. This court has had occasion to go rather fully into the matter of free time on Philadelphia wharves. Baltimore & Ohio R. R. Co. v. United States, 3 Cir., 1953, 201 F.2d 795. We think the question when a consignee must start paying additional charges to the proprietor of the pier for allowing goods to remain there has nothing whatever to do with the question whether a carrier has used reasonable care in discharging goods from his ship.

■■ In this case we disagree with the learned judge who concluded that the carrier had been guilty of negligence. The general test is, of course, the conduct of a reasonable man under the circumstances, and in that test the value of the interest to be protected and the risk of harm are elements to be considered.[6] Here are the

4. 46 U.S.C.A. § 190 provides: "It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

5. The Eddy, 1866, 5 Wall. 481, 495, 72 U. S. 481, 495, 18 L.Ed. 486; Galveston Wharf Co. v. Galveston, Harrisburg & San Antonio Ry. Co., 1932, 285 U.S. 127, 132–134, 52 S.Ct. 342, 76 L.Ed. 659.

6. Restatement, Torts, § 284: "Negligent conduct may be * * *; (a) an act which the actor as a reasonable man should realize as involving an unreasonable risk of causing an invasion of an interest of another * * *."
§ 291(1): "Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the

considerations which we think establish freedom from negligence on the part of the carrier:

The consignee was notified of the arrival of the goods and had removed a very substantial portion of them. He could have removed the remainder had he chosen to pay premium time for the help required. The pier was, on the land side, surrounded by a cyclone fence. The gates which admitted freight cars were kept closed all the time except when in actual use in the passage of trains. The gate available to ingress and egress of trucks was manned by both employees of the pier and United States Customs. Drivers had to have a pass to enter. Trucks coming in full were inspected as they went out claiming to be empty. The pier was constantly patrolled by pier employees. While it is true that they rather carefully stated they were fire guards only, it was admitted that if anyone was creating a disturbance at night removing goods they would find it out without doubt. In fact the pier manager testified that even if someone appeared at the pier at midnight in a small boat and removed goods, the guards would see and report it. The head of the watching crew was armed at the time of the events herein considered. On the water side there were two steel metal walls at either end of the pier which opened from the inside only, and could be forced open from the outside only by a "fork-lift truck." As we understand the facts, there was an open space toward the water and accessible from there only.

This freight was bulky. It suffered no danger from exposure to weather, obviously. It could be removed only by use of an apparatus described by one of the witnesses as a "half lift truck with a scoop on the front of it." Testimony on behalf of the steamship company's local agent indicated that when there was a shipment lying on the pier which could be easily broken into the company provided a watchman until it was removed. For bulky freight of this type he admitted that it did not.

Our conclusion upon consideration of these facts is that there was no negligence on the part of the carrier in allowing this material to remain on the pier without a special guard. We think the risk that anybody would come in either over the fence, through the gate, or from the water and remove these heavy objects undetected was so slight as to be negligible.[7]

The judgment of the district court will be reversed and the case remanded with direction to enter judgment for the respondent.

McLAUGHLIN, Circuit Judge (dissenting).

The primary problem here is whether the missing scrap was delivered by the carrier to the consignee. The question of negligence in the delivery or thereafter is never reached. From the clear facts what the carrier insisted upon and attempted was actual delivery, retaining possession meanwhile. It did so deliver part of the shipment. The balance, assuming that the scrap had been entirely unloaded, was never delivered to libellant.

Appellant admits its obligation to deliver. Throughout its briefs it contended that to

utility of the act or of the particular manner in which it is done."

§ 293: "In determining the magnitude of the risk for the purpose of determining whether the actor is negligent, the following factors are important:

"(a) the social value which the law attaches to the interests which are imperiled;

"(b) the extent of the chance that the actor's conduct will cause an invasion of any interest of the other or of one of a class of which the other is a member;

"(c) the extent of the harm likely to be caused to the interests imperiled; and

"(d) the number of persons whose interests are likely to be invaded if the risk takes effect in harm."

7. In Home Insurance Co. v. Philadelphia Piers, Inc., D.C.E.D.Pa.1951, 100 F.Supp. 348, 349, Judge Kirkpatrick held that the same pier involved here (98) "had a good reputation with shipping companies and the protection which it offered to goods stored in it was in every way adequate." Consequently damage by rain to cargo discharged there imposed no liability on the carrier, which was entitled to rely on the physical condition and reputation of the pier as a safe place to leave goods.

accomplish this it had merely to comply with the provision of the bill of lading that the goods be at the risk of their consignee "* * * as soon as delivered from the [ship's] tackle." At oral argument this defense was completely abandoned. The necessity of notice to the consignee and a reasonable time allowance for the latter to remove the scrap was admitted.[8] The appellant insisted it had complied with those elements and therefore had constructively delivered the shipment to North American.

What appellant did in fact was to retain possession of all of the scrap until Friday, April 2, 1948. At that time through its checker it, according to him, "turned over" part of the shipment to appellee's truckers. The following Monday it "turned over" the balance of the shipment *then on the pier* in the same fashion. The truckers on both the 2nd and 5th signed an itemized receipt acknowledging that all of the specified merchandise less the noted missing items was "Received in good order" from appellant's agent and "Delivered to" the individual truckman on each load who signed for same. This was no matter of mere orderly bookkeeping procedure. It was the written evidence of appellee's acknowledgment that the ship had performed its carriage contract *with the exception of the shortage set out in full on the face of the document.* Until the driver signed "the delivery record", as it was called by Harry J. Crane, the clerk in charge of the particular shipment for respondent's agent, he could not leave the pier with this load. That was the procedure every time the drivers came in. Even after April 5th, the date on which it was discovered that some of the scrap was missing, Crane made up a complete list of the scrap and on the list showed that the only groups of items "Delivered April 2, 1948" were those signed for that day in the delivery receipt. The list showed what remained on the pier at 5:00 P.M., April 2nd, what was on the pier 8:00 A.M. April 5th, and what was missing at that time.

In the face of the above evidence, not only uncontroverted but from the appellant's own witnesses and exhibits, Finding of Fact 20 by the district judge cannot be properly set aside. That finding reads:

"20. That portion of the said total shipment described in Finding 14 above has never been delivered to libellant by the respondent at the Port of Philadelphia or elsewhere."

At the very least, the district judge was not clearly wrong in making that finding. The non-delivery is the gravamen of the libel. Since the scrap in controversy, though apparently on the pier, was still in the possession of the carrier when it disappeared, the responsibility for it as between the carrier and the consignee is that of the former. Quite aside from what follows, this situation requires affirmance of the district court judgment as a matter of law.

Appellant's theory of constructive delivery presents nothing calling for a reversal of the judgment.

The ship docked at Philadelphia March 27, 1948, but it was not until March 29, the day it started unloading, that a notice of arrival was mailed libellant. It does not appear in the record when the notice was received. On Friday, April 2nd, libellant started trucking away its scrap. The job was not finished by 5:00 o'clock that evening, quitting time, and therefore went over to Monday, the 5th, the next working day. The majority seems to think that the consignee should have paid premium time to complete the removal on Friday. This would hardly seem part of consignee's obligation in this ordinary shipping transaction. No reason for it, contract or custom, is in the record.[9] But what does appear is the testimony of respondent's witness, Edward Crane, who checked the scrap for Sobelman Company, respondent's agent. Speaking of this particular shipment he said, "* * * the steamship gives consignee five days to take it off the pier."

8. See The Eddy, 5 Wall. 481, 72 U.S. 481, 18 L.Ed. 486.

9. The need for such extraordinary measures is belied by respondent's argument and the holding of the majority that the pier in question was well-protected.

And the testimony of the general manager of Philadelphia Piers, Incorporated, the owner of the particular pier where the ship docked, was specifically that the pier operation in effect in 1948 was that import cargo, which the scrap was, discharged by a vessel " * * * remains on the pier in the possession of the vessel or its agent until such time as an order is issued to Philadelphia Piers, Incorporated. * * * On truck freight the cargo never comes into the possession of Philadelphia Piers, Incorporated. It is extracted from the vessel and delivered to the truck by the steamship company, remaining solely and always in the possession of the steamship line." The witness went on to say that the pier allowed five days free time (excluding Saturdays, Sundays and holidays) for delivery of import cargo after discharge by the vessel.

There is no issue as to that free time, confused or otherwise, in this record. Whatever may be the quarrel, if any, between the ship and the pier, it is no part of this case.[10] Respondent's objection to the above testimony concerning the custom prevailing at the pier was based solely on the bill of lading provision regarding delivery. Appellant as already stated, now concedes the non-applicability of that provision.

So what we have on appellant's current defense of constructive delivery is that under the prevailing custom in 1948, which has continued to the present, delivery of cargo such as the scrap in controversy is not made until it is delivered to the consignee's truck by the steamship company and up to that time remains solely in the possession of the ship. From the facts there was no constructive delivery to the libellant. The uncontradicted testimony is that when the scrap disappeared it was still in the possession of the ship with the latter responsible for it. On this claim of constructive delivery the District Judge was clearly right in finding no delivery. He should be affirmed.

10. Home Insurance Co. v. Philadelphia Piers, Inc., D.C.E.D.Pa.1951, 100 F.Supp. 348, obviously is not pertinent here. That was a suit between different parties with different issues involved. Good reputation of the pier, etc., in evidence there is not present in this record.