AMERICAN PRESIDENT LINES, LTD., et al., Petitioners,

v.

FEDERAL MARITIME BOARD (now Federal Maritime Commission) and United States of America, Respondents.

No. 16198.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 8, 1961.

Decided May 24, 1962.

Mr. Seymour H. Kligler, New York City, with whom Mr. Elkan Turk, New York City, was on the brief, for petitioners.

Mr. Edward Aptaker, Asst. Gen. Counsel, Federal Maritime Commission, at the time of argument, with whom Mr. Robert E. Mitchell, Deputy Gen. Counsel, Federal Maritime Commission, and Mr. Irwin Seibel, Atty., Dept. of Justice, were on the brief, for respondents.

Mr. Richard A. Solomon, Atty., Dept. of Justice, entered an appearance for respondent United States of America.

Before WILBUR K. MILLER, Chief Judge, EDGERTON, Circuit Judge, and PRETTYMAN, Senior Circuit Judge.

PRETTYMAN, Senior Circuit Judge.

This is a petition to review an order of the Federal Maritime Board, for which

the successor Federal Maritime Commission is now responsible. Petitioners are common carriers by water in the foreign commerce of the United States. The subject of the controversy is demurrage charged for cargo on docks in New York.

■ Ships bringing transoceanic freight into port are required by their transportation obligation, absent a special contract, to unload the cargo onto a dock, segregate it by bill of lading and count, put it at a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it. This was settled by the courts many years ago.[1] Circuit Judge Goodrich stated, in North American Smelting Co. v. Moller S. S. Co.,[2] that "There is no doubt that in discharging the cargo onto the pier and notifying the consignee the carrier was no longer in possession of the goods so as to suffer the risk of loss not due to any negligence on its part." The work of unloading and putting the cargo on the dock is done on behalf of the carrier by longshoremen, who are laborers skilled in this sort of thing, or by stevedoring companies under contract with the carriers, these stevedores employing longshoremen. There is not now, and does not appear ever to have been, absent a special contract, any obligation on the part of the carriers to put such cargo actually into the hands of consignees, as by putting it into trucks and hauling it to the consignees' places of business. Consignees are obligated, after notice and reasonable opportunity, to come and pick up their goods at the pier.[3]

A public interest is involved in the problem created when consignees leave cargo on piers for indefinite periods. A port could be blocked by such practice, to the great detriment of the whole community. This problem became acute in the port of New York. The Maritime Commission, by an order of May 29, 1947, instituted an investigation and rule-making procedure.[4] After long consideration, involving hearings before an Examiner, exceptions, and argument before the Commission, the Commission on October 19, 1948, issued its General Order 69,[5] dealing with the amount of time a consignee must be given to remove his goods from a pier (called "free time"), and the charges to be made upon him if he leaves his goods there too long (called demurrage charges), on import property at the port of New York. The supporting "Report of the Commission" was long and carefully done. The practices of the industry are clearly described. The Commission pointed out mishaps which may prevent a carrier from performing its duty of tender for delivery, and it diagnosed the responsibility. It pointed out that a period of "free time" is part of the transportation service of the carrier. It concluded that under conditions prevailing in New York "five days is the shortest time that affords to consignees a reasonable opportunity to take delivery of imports." It held a tariff which failed "to assure to consignees a minimum of five days of free time" would be unjust and unreasonable.

The Commission then discussed the matter of demurrage charges, which are, on a progressively increasing scale, au-

1. See, e. g., The Eddy, 5 Wall. 481, 495, 72 U.S. 481, 495, 18 L.Ed. 486 (1866); Ex parte Easton, 95 U.S. 68, 75, 24 L. Ed. 373 (1877); The Grafton, 10 F.Cas. 907 (No. 5656) (S.D.N.Y.1844), aff'd, 10 F.Cas. 905 (No. 5655) (C.C.S.D.N.Y. 1846); The Titania, 131 F. 229 (2d Cir. 1904); Southern Pac. Co. v. Van Hoosear, 72 F.2d 903, 907 (9th Cir. 1934); Baltimore & O. R. Co. v. United States, 201 F.2d 795, 797 n. 3 (3d Cir. 1953); Miami Struct. Iron Corp. v. Cie Nationale, Etc., 224 F.2d 566, 568 (5th Cir. 1955).

2. 204 F.2d 384, 386 (3d Cir. 1953).

3. For simplicity's sake we omit discussion of lighterage, which sometimes is involved.

4. The problem in connection with the port of San Francisco was rather exhaustively discussed in California v. United States, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944).

5. Free Time and Demurrage Charges at New York, Docket No. 659, 3 U.S.M.C. 89, as amended, 46 C.F.R. § 226.

thorized after "free time" has expired on a shipment. The Commission said "it is undisputed that the demurrage rate structure is penal in purpose, intended to clear the piers."

Then the Commission discussed the problems posed by inability of either party to perform its obligation. It depicted the difference between events which affect the carrier, so that "cargo cannot be tendered for delivery", and a case in which an event "effectively prevents consignees from removing their shipments." It referred, by way of example, to a trucking strike which blockaded the port so that "many shipments which, although available for delivery, consignees could not remove." The Commission said, "In such cases, neither carriers nor consignees are at fault." Neither, said the Commission, should be subjected to an avoidable penalty or permitted to profit from the other's disability. It held that a carrier was entitled to fair compensation for sheltering and protecting the consignee's property under such circumstances, that the demurrage charge at the lowest rate (i. e., for the first period after "free time") represented a compensatory charge, but that the increased demurrage rates were penal and could not be charged under these conditions. In the order then entered (General Order 69) were two provisions as to demurrage, one in respect to carriers and the other in respect to consignees. They were:

> "3. Where a carrier is for any reason unable, or refuses, to tender cargo for delivery, free time must be extended for a period equal to the duration of the carrier's disability or refusal.
>
> "4. Where a consignee is prevented from removing his cargo by factors beyond his control (such as, but not limited to, trucking strikes or

weather conditions) which affect an entire port area or a substantial portion thereof, carriers shall (after expiration of free time) assess demurrage against imports at the rate applicable to the first demurrage period, for such time as the inability to remove the cargo may continue. * * *."

The ruling was quite clear, it seems to us. Its language fitted precisely into the practice of the trade. Referring to the carriers it said that if a carrier is for any reason unable, or refuses, "to tender cargo for delivery," free time must be extended. The clear underlying premise was that the obligation of the carrier was to tender for delivery, i. e., leave the goods in the designated place of pick-up, for five days.

█ We pause at this point to note what will become important to a decision here. "[T]ender for delivery" and "deliver" are distinct and different terms. The point comes up in various contexts. "Delivery", as respects goods contracted to be sold and delivered, and "tender of delivery" are distinct terms.[6] Under a contract of carriage the carrier made a proper "tender" when it offered the goods to the consignee at the pier.[7] If a seller notifies his buyer of the time and place of delivery according to the terms of a contract, and delivers at the time and place, there is a tender.[8] In the industry concerned in this case there seems to us to be no room for dispute over the nature of the obligation of the carrier. It tenders for delivery; it does not deliver. It makes a valid and complete tender when it puts the cargo on the dock, reasonably accessible, properly segregated and marked, and leaves it there for five days; with notice, of course.

The second pertinent part (par. 4) of General Order 69[9] is likewise clear. It uses language which describes precisely

---

6. Inland Products Corp. v. Donovan, Inc., 240 Minn. 365, 62 N.W.2d 211, 218 (1954).

7. Dohrmann Hotel Supply Co. v. Owl Transfer & Storage Co., 19 Wash.2d 522, 143 P.2d 441, 149 A.L.R. 1108 (1943).

8. Carnation v. Pridgen, 84 Ga.App. 768, 67 S.E.2d 485 (1951).

9. 46 C.F.R. § 226.1(d).

what happens. Its expression is "Where a consignee is prevented from removing his cargo by factors beyond his control", and it goes on to insure its meaning by specifying "such as, but not limited to, trucking strikes". Under those circumstances, says the General Order, the carrier shall assess demurrage at the first demurrage period rate.

■ Years later (November, 1956, and February, 1957) massive strikes of longshoremen at New York occurred. Cargo was immobilized on the docks. A dispute arose between carriers and consignees as to wharf demurrage during these periods. The carriers said that under General Order 69, where demurrage had begun before the strike took effect, they would charge the first period rate for the time during which the goods could not be moved. In other words, the carriers said that, where consignees, unimpeded, had left their goods on the dock after the free time had expired and demurrage had begun to accrue, the consignees should continue to pay, but not at penalty rates.[10] The Board was notified of the practice. Two years later the Board instituted a proceeding. Arguments were presented in written form. The Board then promulgated the order here and now disputed. It read:

"IT IS ORDERED that General Order No. 69 (46 C.F.R. 226) is interpreted to bar common carriers by water from assessing demurrage or storage charges against import property at New York for any period during which they are unable to deliver such property because of a strike by longshoremen, regardless of whether the cargo has been made available for delivery during the entire prescribed period of free time."

In the Federal Register [11] the foregoing order appears under its opening designations thus:

"Chapter II—Federal Maritime Board, Maritime Administration, Department of Commerce

"Subchapter B—Regulations Affecting Maritime Carriers and Related Activities

"[Docket No. 859; General Order 69, Amdt. 2]

"PART 226—FREE TIME AND DEMURRAGE CHARGES ON IMPORT PROPERTY APPLICABLE TO ALL COMMON CARRIERS BY WATER

\*    \*    \*    \*    \*    \*

"Part 226 is hereby amended by adding the following new section and center heading:

*"Interpretation*

"§ 226.2 Applicability of decision and order.

"This part is interpreted by the Federal Maritime Board to  \*  \*  \*."

The first phase of the controversy is whether the new order is an interpretation of General Order 69 or is an amendment of it. We think it is clearly an amendment. Whereas General Order 69 deals, correctly, with the carriers' obligation to tender for delivery, the new order speaks of a period "during which they [the carriers] are unable to deliver such property  \*  \*  \*, regardless of whether the cargo has been made available for delivery during the entire prescribed period of free time." The Board's position, as made clear by its brief and argument here, is that the legal duty of the carrier to deliver continues until the consignee calls for the cargo; that even after free time has expired the carrier has the duty of making the cargo physically available to the consignee's trucks; and that the carrier must provide the labor to load the consignee's trucks. A longshore strike, the Board says, prevents the carrier from fulfilling this obligation. This is a violent shift from the provisions of General Order 69 and introduces a new concept into the industry. A carrier does not, as we have pointed out, under long-established customs and official rules, deliver goods to

---

10. The facts recited in the text were developed in exchanges of correspondence, which was complicated in its detail.

11. 25 Fed.Reg. 13696 (1960).

consignees; it tenders them for delivery, makes them available for delivery. We think the proposal to deny the carriers demurrage charges at the first period demurrage rate, where goods have been properly marked, etc., on the dock for more than five days before the strike began, is a violation of General Order 69; and, as the Commission itself pointed out in its 1948 Report, is a denial of just compensation for a service rendered.

The next question is whether the order is invalid for procedural defects. Section 4(b) of the Administrative Procedure Act [12] provides that, after the notice required for proposed rulemaking (excepting interpretative rules), opportunity for interested persons to participate, and "consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose." In the Senate Judiciary Committee print of June, 1945, which is explanatory of the proposed Administrative Procedure Act and is included in the Legislative History of the Act printed by order of the Senate, the following appears: "The statement of the 'basis and purpose' of rules issued will vary with the rule, but in any case should be fully explanatory of the complete factual and legal basis as well as the real object or objects sought."

No statement of the basis and purpose of the new rule appears, either in the rule itself or in any accompanying report or opinion. The Board says a complete statement of basis and purpose accompanied General Order 69. This is true, but that statement cannot encompass the different rule incorporated in the new order. The Board argues that the new order is an interpretation and therefore this statutory requirement does not apply. We have held hereinabove that the order is not an interpretation but is an amendment of the existing rule. It establishes a new requirement as to the payment of demurrage, clearly different from the requirement which is in the

heretofore existing order (General Order 69). Since the premise for the Board's argument falls, the argument falls. We hold that the quoted provision of Section 4(b) of the Administrative Procedure Act applies and that therefore the new order of the Board must, for procedural validity, include or be accompanied by a statement of the basis and purpose of the order.

For the foregoing reasons the order entered by the Board on December 15, 1960, in Docket No. 859, Free Time and Demurrage Charges—New York, is set aside as invalid and the matter is remanded to the Board for further proceedings in accordance with this opinion.

So ordered.

12.  60 Stat. 238 (1946), 5 U.S.C.A. § 1003 (b).