CALCOT, LTD., et al., Plaintiffs, Appellants,

v.

ISBRANDTSEN COMPANY, Inc., et al., Defendants, Appellees.

No. 6022.

United States Court of Appeals First Circuit.

Heard Feb. 4, 1963.

Decided June 18, 1963.

Joseph S. Mitchell, Jr., Boston, Mass., with whom Patrick J. Wilson, Ponce, P. R., and Gadsby, Colson & Morin, Boston, Mass., were on brief, for appellants.

Enrique Cordova Diaz, San Juan, P. R., with whom Walter L. Newsom, Jr., Brown, Newsom & Cordova, San Juan, P. R., and Foley & Grainger, New York City, were on brief, for Isbrandtsen Co., Inc., appellee.

Miguel J. Rios Lugo, Santurce, P. R., for Luis A. Ayala Colon, appellee.

Before WOODBURY, Chief Judge, and MARIS * and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is an appeal from a judgment of the United States District Court for the District of Puerto Rico dismissing a complaint brought by Calcot, Ltd., and its insurer, Fireman's Fund Insurance Company, both California corporations with their principal offices in that State, against Isbrandtsen Co., Inc., a New York corporation with its principal office in the City of New York, San Juan Mercantile Corporation, a Puerto Rican corporation of San Juan, Luis Ayala Colon, a citizen of Puerto Rico, and the Municipality of Ponce, Puerto Rico, to recover damages for the partial destruction by fire, allegedly due to the defendants' negligence, of 175 bales of raw cotton while on the municipal pier at Ponce, Puerto Rico. Federal jurisdiction is correctly predicated upon either Sec. 1332 of Title 28 U.S.C. or 48 U.S.C. Sec. 863, the amount in controversy being $22,054.91 exclusive of interest and costs. Trial was by the court sitting without a jury, which, at the end of the presentation of the plaintiffs' case, granted the defendants' motion to dismiss for failure to prove a cause of action against any of the defendants.[1]

The following basic facts are not in dispute.

On May 23, 1959, Calcot sold 400 bales of raw California cotton to

---

* By special designation.

1. This court before argument granted an unopposed motion of the Municipality of Ponce that the appeal be dismissed as to it.

Indian Head Puerto Rico, Inc., which owned and operated a textile mill in Ponce. The cotton was shipped under a bill of lading dated June 15, 1959, from Stockton, California, to Indian Head Puerto Rico, Inc., as consignee, on Isbrandtsen's steamship "Flying Hawk." Fireman's Fund insured the cotton for the benefit of Calcot "until delivered to final Warehouse or Mill at the destination named in this policy [Ponce, Puerto Rico] or until the expiry of 15 days [after discharge] * * * whichever shall first occur."

The bill of lading insofar as material contained in Sec. 15 the following provisions with respect to delivery:

"The Shipper, Consignee or owner of the goods, shall take delivery of the goods, whether sound or not sound, at the wharf or place of delivery of the Carrier at Carrier's option: (a) within twenty-four hours after discharge or sooner, as circumstances and/or the nature and/or the condition of the goods may require; (b) within such time as is provided by the regulations and/or custom of the port.

"If the delivery of the goods, whether sound or not sound, is not taken as aforesaid, they may be sent by Carrier to a warehouse, permitted to lie where landed or returned to port of shipment or elsewhere, all at the expense and risk of the Shipper, Consignee and/or owner of the goods.

"When the goods have been discharged and possession of the goods is received or taken by Customs or other authorities, or by the operator or person in charge of any lighter, craft, dock, wharf, pier, store, warehouse, refrigerator, elevator or other facilities, whether selected by the Carrier, the Shipper, Consignee or owner of the goods, or whether public or private the goods shall be considered to have been delivered and at their own risk and expense subject to any lien of the Carrier thereon, and such authority or operator or person shall be considered as having received possession and delivery of the goods solely as agent of the Consignee or cargo owner. Such delivery shall terminate Carrier's liability and Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or misdelivery, or any loss or damage occurring after discharge from the vessel."

The "Flying Hawk" arrived in Ponce on Sunday, July 5, 1959, and on the same day the consignee was notified of the arrival of the shipment and the cotton was unloaded onto the municipal dock at Ponce. The unloading operation was conducted by Luis Ayala Colon, acting as the agent of Isbrandtsen's local agent and representative, San Juan Mercantile Corp., who stacked the cotton in accordance with usual practice on the platform under the canopy or eaves of a shed as designated by the superintendent of the Ponce municipal docks and put it under 24-hour guard.[2] It was not covered by a tarpaulin to protect it from the weather.

On Monday, July 6, 1959, Francisco A. Delgado, a trucker under contract with Indian Head and its representative on the docks, surrendered the bill of lading to the shipper's representative and began to remove the cotton from the dock. He loaded his truck with bales of cotton, took them first to a United States Department of Agriculture fumigation plant in the dock area where they were unloaded and fumigated in compliance with Department of Agriculture requirements, and then loaded the cotton onto his truck again and took it to Indian Head's mill. By the end of the week the trucker had removed 225 bales and had signed cart receipts therefor, one on July 8 for 100 bales and two on July 10 for 100 bales and 25 bales re-

2. The evidence is that at 7 A.M. on Friday, July 10, Ayala Colon removed the guards he had placed over the cotton and there is evidence that he gave notice of his action to the consignee's trucker and dock representative.

spectively. On Sunday afternoon, July 12, the 175 bales of cotton remaining on the dock was substantially damaged by a fire of undisclosed origin.

Calcot replaced the 175 bales of damaged cotton and Fireman's Fund advanced the amount of the loss to Calcot on a "Loan Receipt" reciting that repayment was to be only out of any net recovery that might be had from any vessel, carrier, bailee or others for any loss or damage to the 400 bales of cotton originally insured. Eventually the damaged cotton was sold to Indian Head for its salvage value, and Calcot and Fireman's Fund then brought this action to recover the net loss.

The key findings of the court below are: (1) that at the time the 175 bales of cotton were damaged by fire they were in the "sole and exclusive" possession of the consignee, Indian Head, which had accepted delivery thereof through its agent, the trucker, and that at the time of the fire the cotton was on the dock by the "mere sufferance" of the Municipality of Ponce, which permitted the consignee to leave it there and remove it little by little at its convenience, and (2) that the plaintiffs had failed to show that the fire and the consequent damage to the cotton were caused by the negligence or fault of any of the defendants.

The appellants assail the first finding on the ground that it is not supported by the evidence. They assail the second finding on the same ground and they also assert that it is erroneous because it puts the burden of persuasion on the issue of negligence upon them as the plaintiffs below instead of upon the defendant carrier, where they say the burden belongs under the Harter Act, 46 U.S.C. § 190 et seq.

The basic question on this appeal is whether the risk of loss had passed by the time the cotton was damaged by fire, and this in turn is determined by whether or not the carrier, Isbrandtsen, through its agent and subagent, San Juan Mercantile and Ayala Colon, respectively, had delivered the 175 bales of cotton to the consignee, Indian Head.

The appellants argue that the failure of the consignee's agent to sign cart checks for the 175 bales that remained on the dock at the time of the fire shows clearly and conclusively that the consignee had not taken delivery of those bales. We do not agree, for we agree with the United States Court of Appeals for the Third Circuit in the comparable case of North American Smelting Co. v. Moller S. S. Co., 204 F.2d 384, 386 (1953), in which the court rejected the contention that giving receipts by an employee of the consignee to the agent for the steamship company during the course of removal of a shipment from a pier showed that the carrier was still in possession of the goods and responsible for them. It said: "We regard the receipt rather as a matter of orderly bookkeeping procedure having no significance on the question of whether the carrier had fulfilled its duty to the consignee." And in the case at bar it is very evident that the parties themselves regarded the cart receipts as only a bookkeeping procedure, for the receipts were not signed coincidentally with the removal of the cotton. The receipts were signed on July 8 and 10, whereas the undisputed evidence is that removal of the cotton began on July 6 and except for one day proceeded throughout the week through Friday, July 10.

The appellants also argue that the consignee had not taken delivery of the cotton within the time provided by either the regulations or the custom of the port of Ponce, so that Isbrandtsen's partial reliance upon option (b) of the first paragraph of Sec. 15 of the bill of lading, quoted hereinabove, is misplaced.[3] The "regulations" to which they refer are contained in a pamphlet of "Charges for Storing and Demurrage" approved by

---

3. The court below, in addition to its finding of "actual delivery," found that the periods of time referred to in alternatives (a) and (b) of the first paragraph of Sec. 15 of the bill of lading "had transpired when the fire occurred."

the Public Service Commission of Puerto Rico; and the so-called "custom" refers to the practice on the Ponce municipal pier of waiving storage charges for cotton cargo after expiration of the regulatory five-day "free period" on account of the delay occasioned by the fumigation process. Here, too, we are guided by the reasoning in the North American Smelting Co. case, supra, wherein the court said: "[The] issue was somewhat confused, we think, by references to the so-called five-days free time rule which prevails on this pier. * * * We think the question when a consignee must start paying additional charges to the proprietor of the pier for allowing goods to remain there has nothing whatever to do with the question whether a carrier has used reasonable care in discharging goods from his ship." In other words, rules and customs concerning storage charges have no relevance to the question of what constitutes a proper delivery of the cargo.

■ It has long been a settled rule of general maritime law that a sea carrier's liability ends when delivery is on the wharf and suitable and reasonable notice of arrival is given the consignee so as to afford him a fair opportunity to remove the goods or put them under proper care and custody. The Eddy, 5 Wall. 481, 495, 18 L.Ed. 486 (1866); Galveston Wharf Co. v. Galveston, Harrisburg & San Antonio Ry. Co., 285 U.S. 127, 132, 134, 52 S.Ct. 342, 76 L.Ed. 659 (1932); The Bellingham, 57 F.2d 1015, 1018 (C.A. 3, 1932); and North American Smelting Co. v. Moller S. S. Co., supra. All this was here afforded the consignee, and his surrender of the bill of lading confirms that fact. Even if the consignee could not have removed all the cotton to its mill before the fire, it could have taken steps to protect it. The cotton was certainly at the consignee's disposal throughout the time it lay on the dock, and, as the court below found on adequate evidence, it lay there at the

consignee's convenience. Thus, under the above rule of general maritime law, we think the court below correctly concluded that there had been an actual delivery of the cotton prior to its partial destruction by the fire.

■ Nor do we think that reliance upon the above rule of general maritime law in any way conflicts with the delivery provisions of the bill of lading. It may be that alternative (a) of the first paragraph of Sec. 15 requires precise notification of reliance thereon rather than general notice of arrival and wharf discharge pursuant to the maritime rule. Nevertheless, the third paragraph of Sec. 15, quoted herein above, clearly evidences an intention to accelerate delivery to the earliest moment consonant with the general maritime rule; and to that extent we see no reason why the carrier should not have the benefit of this stipulation. In any event, as the case of Isthmian Steamship Co. v. California Spray-Chemical Corp., 300 F.2d 41, 43 (C.A. 9, 1962), clearly states, it is the general maritime rule which determines whether there has been "proper delivery" so as to terminate the applicability of the Harter Act. And, as noted earlier, the appellants' argument that it was erroneously assigned the burden of proving the appellees' negligence is based upon the applicability of the Harter Act and so must fall with it upon a finding of "proper delivery."

After proper delivery at the wharf Isbrandtsen's duty as a carrier with respect to the goods was at an end. Thereafter it or its agents could be liable for damage to the cotton only in the same way and to the same extent as any stranger to the contract of carriage. There being ample evidentiary support for the court's conclusion that the plaintiffs had not affirmatively shown any negligence on the part of any of the defendants, its judgment was proper.

Judgment will be entered affirming the judgment of the District Court.