**SEANTO EXPORTS, Plaintiff,**

v.

**UNITED ARAB AGENCIES Defendant.**

**No. 96 Civ. 8787(CBM).**

United States District Court,
S.D. New York.

April 12, 2001.

---

Krishnan Shanker Chittur, New York City, for Plaintiff.

Robert Milana, London Fischer, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

MOTLEY, District Judge.

This non-jury action was brought to determine the liability of the parties for the loss of cargo auctioned by U.S. Customs

for failure to enter the cargo into the United States. Plaintiff Seanto Exports ("Seanto") sued defendant United Arab Shipping Co. ("United Arab"), making claims under U.S. Admiralty Law 46 U.S.C. § 1300 (Count I) and New York state laws of conversion and fraud (Counts II and III). The following are the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

On July 6, 1995 Seanto, as shipper, delivered one sealed container GSTU406281–3 ("the container") said to contain 327 cartons of men's garments to United Arab to be transported from Bombay, India, to New York. On the same date, United Arab accepted the sealed container for ocean transportation and issued bill of lading number NSVA014064. The original bill of lading listed United American Industries ("UAI") as the "notified party" or consignee, in the original bill of lading.

United Arab transported the container from India to New York without incident and discharged the container on August 11, 1995 into Maher Ocean Terminal at New York. United Arab had notified UAI of the pending arrival of the vessel carrying the container on August 11, 1995; however, UAI did not take possession of the shipment. Due to a billing dispute between Seanto and UAI, Seanto would not deliver the bill of lading to UAI. Without this bill of lading, United Arab could not release the cargo to UAI. Therefore, neither UAI nor any other consignee, nor Seanto, itself, ever received delivery of the cargo or entered it into the United States through United States Customs.

On October 27, 1995, Seanto wrote to Transworld, United Arab's agent in India, requesting that United Arab amend the bill of lading to reflect DVH Industries, Inc. ("DVH") as the notified party in the bill of lading. This would enable DVH to receive delivery of the cargo. By facsimile of November 1, 1995 Transworld responded in writing that it would amend the bill of lading if Seanto would pay the outstanding charges incurred for the shipment and storage of the container amounting to $5,607 at that time. By letter of November 22, 1995, Seanto requested that United Arab's assist with "1. waving [sic.] the demurrage charges 2. give us the clearance of the consignment to the new consignee." (Def.Ex. H). United Arab, through Transworld, agreed to negotiate a deal with Seanto, through Seanto's agent, Rajan Mangeshkar, whereby the freight and duty charges would be paid by the consignee at the time the goods were picked up, but Seanto would pay, in India, a reduced amount for the container rental charges ($185.64) as well as a $100.00 fee to amend the bill of lading. On December 22, 1995, United Arab provided Seanto with the amended bill of lading.

Meanwhile, at the time the cargo was discharged, U.S. Customs required that cargo be entered into the United States within 30 days of its discharge at the terminal. On November 28, 1995, the container was seized by U.S. Customs for lack of entry into the United States. The container was placed into a government warehouse, called a general order warehouse. On March 14, 1996, United States Customs auctioned the garments. Neither Seanto nor its consignees ever appeared at Maher Terminal to redeem the cargo.

The central factual issues in contention between the parties are whether United Arab informed Seanto that, respectively: its goods were about to be seized, had been seized and would be auctioned. Seanto claims it was never informed by United Arab that the cargo was in danger of being seized. However, Transworld's agent, Indrajid Ray, testified that on No-

**448**

vember 15, 1995, and on several other occasions later in November, he informed Seanto that the goods would be seized and transferred to a government warehouse. (DT Ray 10—16). Seanto denies these conversations took place. Nonetheless, United Arab has produced evidence of a facsimile sent by United Arab on November 15, 1995, to Transworld informing it that the goods would be transferred to a government warehouse. (Def.Ex. E). Furthermore, Transworld twice referred to the government warehouse while forwarding Seanto's request for a compilation of charges to United Arab, once on November 22, 1995, and once on Nov. 23, 1995. In those requests, Seanto was asking specifically about the charges for a government warehouse. (Def.Ex. G, I). Furthermore, Seanto's agent, Mangeshkar, admits that he was aware that if the goods were not eventually entered through customs they would be seized, although he denies any knowledge of the exact timing of such seizure. (TT 62) In addition, although Mangeshkar asserted in his testimony at trial that he did not remember clearly his conversations with Transworld, in response to the question of whether there had been conversation with Transworld regarding an auction, Mangeshkar responded that he had been told that Seanto must take delivery of the cargo as early as possible. (TT 57). Finally, United Arab had nothing to gain by arranging for the cargo to be auctioned by U.S. Customs without Seanto's knowledge. United Arab had arranged to be paid for its outstanding shipping charges upon the sale of the cargo to Seanto's consignee and could only profit from the successful transfer of the cargo to the consignee.

The evidence leads the court to conclude that United Arab made a good faith effort to inform Seanto that the container was in danger of being seized by U.S. Customs. However, there seems little doubt that if Seanto was aware that its goods were being placed in a General Order Warehouse, it was not aware of the significance of that placement. The issues before this court are, therefore: (1) did United Arab have a duty to safeguard Seanto's cargo and/or inform it of the consequences of its failure to redeem the cargo; (2) did United Arab convert Seanto's cargo; and (3) did United Arab fraudulently represent to Seanto that it was safeguarding the cargo?

### CONCLUSIONS OF LAW

Plaintiff pleads that United Arab is liable for the loss of cargo under both federal admiralty law (Count I), and under New York state law (Counts II and III). As discussed below, plaintiff fails to establish United Arab's responsibility under any of these theories.

### 1. Count I—Breach of Bailment Contract

■ Plaintiff alleges that United Arab breached a bailment contract when it lost control of the cargo to U.S. Customs. In an admiralty case regarding post-discharge loss or damage of goods, the court may find that a shipper was a bailee under one of two theories: (1) that the shipper was a bailee pre-delivery under federal law; or (2) that the shipper was a bailee post-delivery pursuant to a land-based bailment contract. *See Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 807 n. 5 (2d Cir.1971); *Brocsonic co. Ltd. v. M/V Mathilde Maersk,* 120 F. Supp 2d 372, 378—79 (S.D.N.Y.2000); *R.B.K. Argentina S.A. v. M/V Dr. Juan B. Alberdi,* 935 F.Supp. 358, 370—71(S.D.N.Y.1996). As explained below, plaintiff fails to prove its claim on either of these theories.

## A. Federal Law—The Harter Act

■ The Harter Act, 46 U.S.C. § 190 *et seq.* (1994), governs the responsibilities of carriers after discharge and before delivery. "The Harter Act reinstated the common law duty of carriers to deliver the goods from wharf to wharf, notify the consignee of the vessel's arrival and to protect the cargo until the consignee had a reasonable opportunity to remove it. These obligations are subject to modification based upon the law, regulations and custom of the port in question." *Farrell Lines Inc. v. Highlands Ins. Co.*, 696 F.2d 28 (2d Cir.1982) (citations omitted). Thus the carrier retains responsibility for the cargo until "proper delivery" has been made. "The Harter Act does not itself define "proper delivery," but case law has defined it as:

> either actual or constructive delivery. Actual delivery consists [of] completely transferring the possession and control of the goods from the vessel to the consignee or his agent. Constructive delivery occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods or put them under proper care and custody."

*C.P. USA v. Mercury*, 2000 WL 1576885 (S.D.N.Y.2000) (quoting *Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734 (4th Cir.1993)).

■ In this case, as the cargo was never transferred to the consignee or to Seanto, the only question to be decided is whether there was constructive delivery. As noted above, to constitute a constructive delivery, the cargo must be discharged upon a "fit wharf," and the consignee must be given notice as well as a reasonable opportunity to collect the goods. *See id.; see also*

*Farrell Lines,* 696 F.2d 28; *Savannah,* 1997 WL 751991 at *4. In this case, there is no disagreement as to the facts that United Arab discharged the goods at Maher Terminal and notified UAI, Seanto's original consignee. Seanto does not contend that the wharf was unfit or that the consignee was not given notice. Therefore, in order to prove that constructive delivery did not take place, Seanto must show that its consignee did not have a reasonable opportunity to collect the goods before United States Customs seized the goods.

Although "[t]he general principle is well settled that the consignee, on receiving notice of the time and place of discharge, must attend and take his goods within a reasonable time," *Unnevehr v. The Hindoo,* 1 F. 627, 629 (S.D.N.Y.1880), the courts have been vague in defining what constitutes a reasonable time for the consignee to pick up its goods. The majority of the cases addressing this issue are based on factual situations where damage occurred to the goods in between discharge and actual possession by the consignee. These cases generally address a delay of days or weeks at most, not, as in this case, months. *See, e.g., Ins. Co. of North America v. Italica,* 567 F.Supp. 59, 62 (S.D.N.Y.1983) (holding that a delay of 10 or 11 days by a consignee was not unreasonable, and that while the consignee's delay of 28 days might be unreasonable, evidence showed that the damage to the cargo occurred within the first 10 days after discharge).

Cases where the consignee failed completely to retrieve its goods from a fit wharf are rare. However, in *David Crystal, Inc. v. Cunard Steam–Ship Co.,* 339 F.2d 295, 298 (2d Cir.1964), the Second Circuit indicated that when a consignee

fails to accept the goods, the situation would be covered by the Supreme Court case, *The Eddy,* 5 Wall. 481, 72 U.S. 481, 495, 18 L.Ed. 486 (1900), which held:

> Where the contract is to carry by water from port to port an actual delivery of the goods into the possession of the owner or consignee, or at his warehouse, is not required in order to discharge the carrier from his liability. He may deliver them on the wharf; but to constitute a valid delivery there the master should give due and reasonable notice to the consignee, so as to afford him a fair opportunity to remove the goods, or put them under proper care and custody. When the goods, after being so discharged ... are not accepted by the consignee or owner of the cargo, the carrier should not leave them exposed on the wharf, but should store them in a place of safety, notifying the consignee or owner that they are so stored, subject to the lien of the ship for the freight and charges, *and when he has done so he is no longer liable on his contract of affreightment.*

*Id.,* at 495, 5 Wall. 481 (emphasis added); *see also Calcot, Ltd. v. Isbrandtsen Co., Inc.,* 318 F.2d 669 (2d Cir.1963); *The Titania,* 131 F. 229, 230 (2nd Cir.1904).

■ Whether the court now refers to the precedent of the more recent damaged-cargo cases, or to *The Eddy,* the outcome is the same. United Arab secured the cargo at Maher Terminal and informed both the consignee and Seanto of its arrival and location. At any time between the discharge of the cargo on August 11, 1995 and its auction on March 14, 1996, Seanto could have redeemed the cargo and entered it into the United States. The mere fact that the cargo could have been seized by U.S. Customs within 30 days of its arrival at Maher Terminal indicates that Seanto's delay of over seven months was unreasonable, in light of the "law, regulations and custom of the port in question." *Farrell Lines Inc. v. Highlands Ins. Co.,* 696 F.2d 28 (2d Cir.1982). Therefore, United Arab performed constructive delivery and United Arab's responsibility as a carrier under United States admiralty law ceased upon completion of that delivery.

### B. State Law—The Carrier's Duties Post–Delivery

As the court now holds that United Arab effected proper delivery, the only conceivable claim brought by plaintiff against United Arab as a bailee would fall under New York State bailment law. *See Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 807 n. 5 (2d Cir.1971); *Brocsonic co. Ltd. v. M/V Mathilde Maersk,* 120 F. Supp 2d 372, 378—79 (S.D.N.Y.2000); *R.B.K. Argentina S.A. v. M/V Dr. Juan B. Alberdi,* 935 F.Supp. 358, 370—71 (S.D.N.Y. 1996). However, Seanto has produced no evidence of any new contract between itself and United Arab that would create a new obligation on the part of United Arab to safeguard Seanto's cargo after delivery. The original contract between Seanto stated that post-delivery, "at the option of the carrier the goods may be stored afloat or ashore at the expense ... and risk in every respect whatsoever of the shipper, consignee and/or owner of the goods but subject to carrier's lien." (Def.Ex. A, pp. 12). According to this contract, Seanto assumed the risk to the cargo once United Arab had delivered it and United Arab's obligations under U.S. admiralty law ceased.

■ Seanto points to the arrangement in November whereby the bill of lading

was amended asserting that it was understood that United Arab would safeguard the cargo. However, Seanto has produced no evidence that United Arab agreed to reassume responsibility for the cargo and the court finds it improbable that United Arab would agree to do so for the price of a mere $100.00 at the same time it was negotiating to be paid for the fees it was already owed. Indeed, Seanto's owner, Sanjay Sanghai, testified at trial that the $100.00 was payment only for the amendment of the bill of lading. Therefore, the court now holds that post delivery, United Arab was not Seanto's bailee.

For the reasons set forth above, the court now dismisses Count I of the complaint.

### 2. Count II—Conversion

 Under New York law, the elements of conversion are: "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Heneghan v. Cap–A–Radiator Shops,* 132 Misc.2d 936, 506 N.Y.S.2d 132, 134 (1986); *Matzan v. Eastman Kodak Co.,* 134 A.D.2d 863, 521 N.Y.S.2d 917, 918 (1987); *Bekhor v. Josephthal Group, Inc.,* 2000 WL 1521198 (S.D.N.Y.2000). In addition, "[c]onversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.... Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." *Schwartz v. Capi-*

*tal Liquidators, Inc.,* 984 F.2d 53,53 (2d Cir.1993) (citing *Johnson v. Gumer,* 94 A.D.2d 955, 464 N.Y.S.2d 318, 319 (4th Dep't 1983); *Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dep't 1981)). Seanto cannot establish a claim of conversion against United Arab. By Seanto's own admission, United Arab did not have control of the cargo after United Arab discharged the Cargo at Maher Terminal. (Pl. Proposed Findings of Fact and Conclusions of Law at 3). At no time after discharge did United Arab exercise unauthorized dominion or a right of ownership over the cargo. The cargo was available at all times that it was in United Arab's possession for Seanto or its consignee to redeem it. If United Arab did not have control of the cargo, it could not have converted it.

For the reasons set forth above, the court now dismisses Count II of the complaint.

### 3. Count III—Fraud

 Under federal law and New York common law, to state and prevail on a claim of fraud, plaintiff must establish: (1) defendant made materially false representations, (2) defendant knew the representations were false, (3) defendant acted with intent to defraud plaintiff, and (4) plaintiff reasonably relied on the false representations. *See Marcus v. AT&T Corp.,* 138 F.3d 46, 63 (2d Cir.1998). Plaintiff must prove the elements of fraud by clear and convincing evidence. *Schlaifer Nance Co. v. Estate of Warhol,* 119 F.3d 91, 96 (2d Cir.1997). Here, Seanto has failed to establish by clear and convincing evidence that United Arab made any false representations or that United Arab intended to defraud Seanto. Although Seanto's agent, Mangeshkar, states that Transworld told

him that United Arab had possession of the cargo, he could not remember the dates of those conversations and it is entirely possible that they took place before the goods had been transferred to the government warehouse. (TT 67). Furthermore, as described above, United Arab has produced evidence that it attempted to inform Seanto that the cargo was going to be transferred to the government warehouse. Even if Seanto was not aware of the significance of that transfer, Seanto has produced no evidence that United Arab lied about either the location of the cargo or about its intentions to safeguard the cargo.

For the reasons set forth above, the court now dismisses Count III of the complaint.

## CONCLUSION

For the foregoing reasons, the court finds that plaintiff failed to establish liability on the part of defendant for the loss of its cargo under either United States admiralty or New York law. Accordingly, plaintiff's claims against United Arab are hereby DISMISSED.

**SO ORDERED.**