MORSE ELECTRO PRODUCTS CORP., Plaintiff,

v.

S. S. GREAT PEACE, her engines, etc., TA Cheng Marine Co., Ltd., Norton Lilly & Co., Inc., Maher Terminals Company, Inc., W. J. Byrnes & Co. of New York, Inc., Ultimate Distributions Systems, and Interport Trucking Co., Defendants.

MAHER TERMINALS COMPANY, INC., Third-Party Plaintiff,

v.

SULLIVAN SECURITY SERVICE, Third-Party Defendant.

Civ. A. No. 74–457.

United States District Court, D. New Jersey.

Sept. 7, 1977.

Martin B. Mulroy, Edison, N. J., for plaintiff; Bruce J. Hector, New York City, of counsel.

Thomas G. Aljian, Warren, N. J., for defendant Ta Cheng Marine Co., Ltd., and Norton Lilly & Co., Inc.; Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City by Peter J. Zambito, New York City, of counsel.

Gurry & Conlon by Thomas P. McHugh, South Orange, N. J., for defendant Maher Terminals Company, Inc.; McHugh, Heckman, Smith & Leonard by James M. Kenny, New York City, of counsel.

Lum, Biunno & Tompkins, Newark, N. J. by Raymond W. Troy, Newark, N. J., for defendant W. J. Byrnes & Co. of New York, Inc.

M. Keith Marshall, West Orange, N. J., for defendants Interport Trucking Corp. and Ultimate Distribution Systems, Inc.; Leo Howard, New York City, of counsel.

## OPINION

COOLAHAN, Senior District Judge.

■ Plaintiff, Morse Electro Products Corp. (hereinafter Morse), is the consignee of 466 cartons of 8-track tape recording/playing decks shipped f. o. b. from Kobe, Japan, to Port Newark, New Jersey, aboard the vessel S.S. Great Peace. Plaintiff claims it failed to receive 432 of these cartons because of a "misdelivery" of the cargo to an unknown thief. This admiralty action[1] requires that a determination be made as to who among the parties should bear the loss of the cargo.

Plaintiff moves for summary judgment pursuant to Fed.R.Civ.P. 56(a) against defendant Ta Cheng Marine Co., Ltd. (hereinafter Ta Cheng), the carrier and owner of the S.S. Great Peace. Ta Cheng moves to dismiss the complaint, and moves, in the event it should be held liable to Morse, for summary judgment on the issue of indemnification against defendant Maher Terminals Company, Inc. (hereinafter Maher), the terminal operator. W. J. Byrnes & Co. of New York, Inc. (hereinafter Byrnes), plaintiff's customs broker-freight forwarder, moves for summary judgment against plaintiff. Interport Trucking Corp. (hereinafter Interport) and Ultimate Distribution Systems, Inc. (hereinafter Ultimate), the designated truckmen, move for summary judgment against plaintiff and cross-claimant defendants Maher and Byrnes.[2] All of these motions have been submitted on the papers in accordance with Fed.R.Civ.P. 78.[3]

On February 14, 1973, Ta Cheng, the carrier, issued an on-board bill of lading (No. TRSKN–12) at Kobe, Japan, which acknowledged receipt in apparent good order and condition of 466 cartons containing six 8-track tape recording/playing decks per carton. The cartons were to be delivered at the Port of New York to the order of First National City Bank, whose assistant cashier endorsed the reverse side of the bill of lading over to plaintiff, Morse. See Exhibit 1 to plaintiff's answer to Ta Cheng's interrogatories. Ta Cheng agreed to notify Morse, the consignee of the cargo, of the arrival date. Norton Lilly & Co. acted as Ta Cheng's New York agent.

---

1. Jurisdiction of the claims arising under the bill of lading is properly cognizable under this Court's admiralty jurisdiction. 28 U.S.C. § 1333(1). The parties request the Court to exercise pendent jurisdiction over the claims sounding in tort and contract. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). See also, Fed.R.Civ.P. 9(h).

2. Defendant-third-party plaintiff Maher cross-claims against Byrnes, Ta Cheng/Norton Lilly and Interport/Ultimate. Defendant Ta Cheng/Norton Lilly cross-claims against Maher, Byrnes, and Interport/Ultimate. Defendant Byrnes cross-claims against Maher, Ta Cheng/Norton Lilly, and Interport/Ultimate. Defendant Interport/Ultimate cross-claims against Maher, Byrnes, and Ta Cheng/Norton Lilly.

3. All defendants' motions for summary judgment are brought pursuant to Fed.R.Civ.P. 56(b).

Byrnes had been for several years prior to and at the time of the misdelivery the customs broker for Morse. Byrnes would pay both customs and freight duties and clear the import. It would also issue delivery orders to the trucking company designated by Morse (deposition of Robert W. Hughes, Byrnes' import manager, pp. 64–65). Since 1972 Morse's designated truckmen had been Interport and Ultimate.[4] Herbert Reader of Ultimate provided the messenger to pick up Morse's delivery orders. (Affidavit of Anthony Firrielo, vice president of Byrnes, ¶ 5.)

On April 1, 1973, the cargo arrived at Port Newark. The day before, March 31, Morse was notified of the expected date of arrival. (Traufield deposition, pp. 25–26.) The entire shipment of 466 cartons was received by Maher and placed in shed No. 141 at the terminal. (Deposition of Frank Jadach, senior vice president of Maher operations, p. 41, lines 8–9, 24–25; p. 52, lines 1–3.) Maher arranged the security at the terminal. (Jadach deposition, p. 58, lines 11–14).[5] None of Norton Lilly's personnel was physically at the pier or the terminal. (Jadach deposition, p. 56, lines 23–25.)

Byrnes was notified of the delivery. On April 3, 1973, Byrnes prepared in quintuplicate a delivery order designating Interport as the truckman for the cargo. Byrnes addressed the order to Maher's terminal delivery clerk of the S.S. Great Peace, who would release the cargo to truckmen bearing a proper delivery order. (Maher's answer to cross-claimant Ta Cheng's interrogatories, ¶¶ 31, 32.)

Byrnes received from Morse the shipping documents before the S.S. Great Peace arrived in port. Delivery orders are routinely prepared by a clerk at Byrnes but are left undated until the cargo is cleared through customs and a permit has been lodged at the pier. On April 3, 1973, identification permit No. 034228 was lodged covering the subject shipment with customs at shed 141. Therefore, on April 3, Lori Eadicicco, Byrnes' clerk, signed and dated the original delivery order (No. 38245) and named Interport and Ultimate as designated truckmen. (Affidavit of Anthony Firrielo, ¶¶ 1–6.)

According to Firrielo, Byrnes' vice president (Firrielo affidavit, ¶ 7), Byrnes followed the routine procedure established by Interport and Ultimate in 1972. This procedure required Byrnes to place several delivery orders designating Interport and Ultimate together in a sealed envelope addressed to them. Interport/Ultimate's messenger would then pick up the envelope. Delivery orders are normally kept in the desk drawer of the preparer. (Byrnes' answers to Ta Cheng's interrogatories, 6.) Blank delivery orders are also kept in Byrnes' warehouse.

Byrnes states that at approximately 4:45 p.m. on April 3, 1973, Interport's messenger, Jack Schwartz, picked up the sealed envelope which contained two copies of the delivery order for the 466 cartons of tape-players, along with two other delivery orders for cargos belonging to Morse.[6] Another copy of the delivery order for the tape-players was sent to Ann Laona (or Leona), an employee of Morse. (Affidavit of Lori Eadicicco, Byrnes' employee, ¶¶ 1–5; see also, Hughes deposition, p. 77, lines 3–6, 20–25; p. 78, lines 3–5.) Lori Eadicicco placed the sealed envelope along with another sealed envelope addressed to Interport/Ultimate in a pick-up box on her desk. (Eadicicco affidavit, ¶¶ 6–7.)

Interport denies ever having received this delivery order. (Interport's answers to Byrnes' interrogatories, 4–5, 6d, 7a.) Byrnes, however, contends the delivery order was sealed in the envelope which Interport picked up on April 3. Interport's messenger, who was well known to Byrnes' employees, contends that he was not required to sign for the envelopes.

---

**4.** Interport was the trucking company, and Ultimate was the warehousing company.

**5.** Maher employed Sullivan Security Service.

**6.** One of the other two delivery orders was for 151 cartons of tape-players. Another envelope with two delivery orders for Morse consigned goods was prepared on April 2, 1973, and placed in the same box. (Byrnes' answers to Ta Cheng interrogatories, 11–14.)

The following day, April 4, two truckmen claiming to be from Allied City Express (hereinafter Allied) presented a delivery order on Byrnes' stationery accurately describing the cargo of 466 cartons of tape-players but designating Allied instead of Interport as truckman. The truckmen first presented the delivery order to customs at the pier and received an authorization for release. However, because the cargo had not yet been discharged, they were not permitted to take the cargo away.

On April 10, 1973, the Allied truck returned, again presenting the delivery order. Maher employees gave the truckmen 216 cartons of the cargo. The next day, April 11, another 216 cartons were loaded onto the Allied truck pursuant to the bogus delivery order. A total of 432 of the 466 cartons were misdelivered.

The bogus delivery order was signed "H. Kingman," a fictitious signature. Allied had no employee by that name and had no knowledge of Morse's cargo. Obviously someone had obtained the original delivery order and a blank Byrnes delivery order form. The blank form was conformed to the original, substituting only Allied for Interport and a fictitious signature for that of the Byrnes employee. Byrnes' employee notes, however, that the fraudulent delivery order lacked a customs identification number. (Hughes deposition, pp. 71–72.)

In the late afternoon of April 12, Ann Laona of Morse called Byrnes to inquire as to when Morse could expect delivery.[7] A check of Byrnes' records showed that the delivery order had been picked up on April 3. (Firrielo affidavit, ¶ 8.) Byrnes called Interport's president, Horace Schwartz (no relation to Interport's messenger, Jack Schwartz), who denied ever having received the delivery order for the 466 cartons of tape-players. Byrnes claimed that the Interport/Ultimate messenger signed for the order. (Firrielo affidavit, ¶¶ 9–10.) Jack Schwartz denied signing for the order as no

signature was normally required. (Byrnes answers to Ta Cheng's interrogatories, 16; Interport answers to Byrnes interrogatories, 2–3.) On April 13 a duplicate delivery order No. 38245 was sent to Interport. Horace Schwartz called Byrnes back on April 17 to advise that 432 of the cartons had already been picked up. Schwartz had been told by Maher's delivery clerk that the cargo had been picked up by Allied on April 10 and 11.

Maher states that its checker was assigned on April 10 and 11 to tally the 216 cartons on each occasion (Jadach deposition, pp. 41, 53) after it received the customs release (Jadach deposition, p. 35). Maher's pier personnel ran a credit check against the name of the truckman, Allied. Approval was received. (Jadach deposition, pp. 45, 59.) Frank Jadach, Senior Vice President of Operations for Maher, stated that the S.S. Great Peace received the usual "clerking" of a vessel; that is, there was a review of all delivery orders presented by truckmen and delivery of cargo to them. The procedures employed by Maher for the S.S. Great Peace were approved by Norton Lilly & Co., Morse's agent. These are the same procedures employed by other terminal operators at the port. (Jadach affidavit.) Norton Lilly inspected the Maher facilities just before the misdelivery. Maher required that truckmen drivers have their pictures taken. Maher also photographs their licenses and verifies the existence and credit of the truckman itself. These procedures, however, failed to prevent the misdelivery. Maher released the balance of 34 cartons to Interport which, in turn, delivered them to Morse. (Jadach deposition, p. 55.) Maher stated that all that was needed for release of cargo was a "Delivery Order." (Jadach deposition, p. 60, lines 18–25; p. 61, line 1.)

Maher reported the theft to the Security Bureau. The investigation disclosed that blank delivery orders are kept in or on

---

7. Plaintiff claims that Ann Laona also called Bob Brown of Interport inquiring about delivery. (Morse answers to Byrnes interrogatories, 2c.) Ann Laona requested a photocopy of the delivery order on April 13 to ascertain whether Interport had picked it up. (Morse answers to Byrnes interrogatories, 4.)

desks of several employees in Byrnes' office. The orders are not numbered, nor are they stamped when issued. No receipts are required, and identification is not required of those picking up the orders. Usually, however, the truckman is known to Byrnes. The investigation led to recovery of 55 full cartons and 4 pilfered cartons. (See Exh. 21, p. 5, to Morse's answers to Ta Cheng's interrogatories.) That together with the delivered cartons left 2,378 tape-players unrecovered. The present action seeks damages for the loss of this unrecovered portion of the cargo.

Before this Court can address the rather difficult legal questions posed by this action, it must first turn its attention to the question of jurisdiction. Clearly, as noted above, p. 478, n. 1, the Court has admiralty jurisdiction over claims arising out of the contract of carriage, bill of lading, between Morse, the consignee of the goods, and Ta Cheng, the ocean carrier. 28 U.S.C. § 1333(1); *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d 800, 807 (2d Cir. 1971); *David Crystal, Inc. v. Cunard Steam-Ship Co.*, 339 F.2d 295, 297 (2d Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965); *North American Smelting Co. v. Moller S. S. Co.*, 204 F.2d 384, 385 and n. 2 (3d Cir. 1953). However, the question of jurisdiction is not resolved so simply. Former Chief Judge Friendly in dictum in *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d at 807 n. 5, observed that the contract of carriage does not continue indefinitely after discharge of the cargo. He continued:

" . . . If a shipper [consignee] is dilatory in calling for his goods, the relationship between the carrier and the shipper would no longer be governed by the

contract of carriage. *Cf.* Carver, *Carriage of Goods by Sea* 697–98 (1957). In such event, it seems likely that any dispute between the parties would no longer be within the admiralty jurisdiction, their relative rights and duties becoming a matter for the common law. However, we need not decide that question, since here there is no claim of unreasonable delay on the part of the shipper in calling for the container."

Ta Cheng, in its supplemental brief, invites the Court to adopt this dictum. Ta Cheng for the first time in its supplemental brief claims that Morse, or its agents, were dilatory in picking up the cargo.[8] The Court must decline the invitation, because to accept it would extend Judge Friendly's dictum to a misdelivery case.

Footnote 5 of *Leather's Best* raises an interesting problem. In a case such as the one at bar, where the only basis for federal jurisdiction is admiralty,[9] footnote 5 would suggest that the Court can only determine it has jurisdiction after it has made a factual decision that the delay in picking up the cargo was not unreasonable. Ta Cheng advances no standard to judge the reasonableness of the delay. Were it not for the fact that the case at bar is a misdelivery as opposed to a theft case, the Court would have great difficulty with this issue.

The distinction between a misdelivery case and a theft case was succinctly made in *David Crystal, Inc. v. Cunard Steam-Ship Co.*, *supra*, 339 F.2d at 298, where the court said:

" . . . The law already recognizes this distinction for a warehouseman [bailee] is absolutely liable for misdeliver-

---

8. The Court would have a problem with a claim raised for the first time in a supplemental brief which could be determinative of both jurisdiction and the merits. Despite the absence of a relevant standard of reasonableness, the facts do not appear to support inordinate delay. But in light of the resolution of this issue on other grounds, the Court need not confront the problems raised by Ta Cheng's belated claim.

9. The pleadings demonstrate that the parties are not diverse. However, in plaintiff's supple-

mental brief, for the first time, it alleges on information and belief that Maher is incorporated in New Jersey and has no office in New York. Plaintiff concludes that there is diversity jurisdiction between it and Maher. Failure to allege diversity *in the complaint* bars this Court from considering the propriety of exercising diversity jurisdiction. *See, Leather's Best, Inc. v. S. S. Mormaclynx, supra*, 451 F.2d at 809 n. 10.

ies but is responsible in trespassory theft cases only where he has been negligent. *See North American Smelting Co. v. Moller S. S. Co.*, 204 F.2d 384 [386 and note 5] (3d Cir. 1953). These differing standards are based on sound policy considerations since it is proper that a warehouseman should bear a greater responsibility for being duped by false pretenses than for thefts that cannot be avoided despite the exercise of ordinary care."

In essence, the misdelivery case is one in which the party in possession of the cargo gives it to one not entitled to receive it. Or, as the court defined the term in *David Crystal* (339 F.2d at 300): "A 'misdelivery' in maritime practice is a technical term of art applied where there is a complete failure to deliver goods to the owner, consignee, or other authorized holder of a bill of lading." In the theft case, the thief steals the cargo from its rightful custodian.

In *Leather's Best* there was no misdelivery. The carrier was not "duped by false pretenses"; the cargo was simply stolen. Judge Friendly's dictum in footnote 5 referred to the fact that since *David Crystal* the contract of carriage had been interpreted as continuing to govern the relationship of the parties until delivery to the consignee. Judge Friendly obviously concluded that the carrier's liability under the bill of lading should not be increased or extended by the unreasonable delay of the shipper (consignee). At some point in time, the liability of the carrier for theft should be restricted to cases where the carrier was negligent under the common law. Consequently, the standard of care would be defined by the applicable State law, and the dispute would no longer give rise to federal admiralty jurisdiction.

Another factor which may have influenced Judge Friendly was that in *Leather's Best* the theft occurred after partial delivery. The shipper had already begun to carry away the cargo. On a Friday the shipper took about half the cargo away from the pier area, but left the remaining half for the next business day, the following Monday. The area where the cargo was stored was guarded and enclosed; the cargo was heavy and not easily transported. The shipper could have removed all of the cargo on Friday had he been willing to pay the extra cost for overtime work or for additional workers. Over the weekend the remaining half of the cargo was stolen. In the context of these facts, the delay may have made the theft possible despite the ordinary care exercised by the carrier. The court concluded that under the circumstances unreasonable delay would terminate the obligation of the carrier to safeguard the cargo under the bill of lading.[10] The facts in the case at bar indicate that the consignee did not exercise any control over the goods. The cargo was misdelivered before its agents attempted to pick it up.

In the case of misdelivery, the cargo is within the control of the carrier or his agents. It is the carrier's error or that of his agents which causes the delivery to the wrong party. The law imposes strict liability for such misdelivery in the absence of controlling language to the contrary in the bill of lading. However, the law recognizes that if the misdelivery is caused by the negligence of the consignee or its agents, then the carrier is relieved of liability. *See, David Crystal, Inc. v. Cunard Steam-Ship Co., supra,* 339 F.2d 295. The delay of the consignee or his agents in calling for the cargo under circumstances where the liability is absolute is clearly distinguishable from the *Leather's Best* situation, as *David Crystal* makes clear. Nor has it been alleged in the case at bar that the delay was the negligent act which caused the misdelivery so as to relieve the carrier of liability, and at the same time deprive this Court of jurisdiction.

The Court is not called upon to reconsider this well accepted distinction between theft and misdelivery cases and the policies underlying it. Consequently, in

---

**10.** The court did not conclude that the delay was in fact unreasonable. It merely concluded that it may have been, given these facts.

light of the continuing viability and persuasive nature of the *David Crystal* case, the Court can only conclude that Judge Friendly's observations in footnote 5, if applied, should only be applied to theft cases. Nor can the Court read Judge Friendly's opinion to suggest a contrary result, as he specifically accepts the logic of *David Crystal* with respect to the distinction between these two types of cases. 451 F.2d at 807.[11]

The Court having admiralty jurisdiction over the claim arising out of the bill of lading, it may now consider whether it should exercise pendent jurisdiction over the claims against the other parties to this suit.[12] Clearly, the Court has the power to hear pendent State claims because they, along with the federal claim, derive from a "common nucleus of operative fact." The federal issue is substantial, and the nature of the claims are such that they would normally be expected to be tried all in one judicial proceeding. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976). In addition, since the merger of our Civil and Admiralty Rules in 1966, there is no longer an impediment to the exercise of pendent and ancillary jurisdiction in admiralty cases.[13] *See*, 3 *Moore's Federal Practice* (2d ed.) § 14.36, pp. 750–752; *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d at 810 n. 11, 810–811 n. 12.

As Judge Friendly observed in *Leather's Best*, 451 F.2d at 810 n. 12, Fed.R. Civ.P. 14(c) adds support for this position.[14] Judge Friendly continued [451 F.2d 810–811 n. 12 (dictum)]:

"But if we were presented with the question, it would be only with the greatest reluctance that we would conclude that under the merged rules the doctrine of ancillary jurisdiction did not extend to admiralty as well as to civil impleader. . . . Certainly the practical considerations which support the doctrine of ancillary jurisdiction in the context of civil impleader are equally persuasive on the admiralty side. . . . In any event, we do not perceive the requirement of independent jurisdiction in premerger admiralty impleader to have had constitu-

**11.** Judge Friendly was a member of the panel that decided the *David Crystal* case. He concurred in Judge Kaufman's opinion except for the part where Judge Kaufman read the language in the bill of lading as not excepting the carrier from liability for misdeliveries. *David Crystal, Inc. v. Cunard Steam-Ship Co.*, 339 F.2d at 300, *et seq.*

**12.** The parties need not specifically plead pendent jurisdiction where the court has admiralty jurisdiction over the principal claim. *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d at 809 n. 10.

**13.** Pendent jurisdiction can serve as a basis for jurisdiction for Morse's direct claims against all defendants who could not have been sued under the Court's admiralty jurisdiction as well as for the cross-claims of the various defendants. Parties may also be impleaded by defendants in a case where the impleaded parties are sued on claims which are properly pendent to the federal claim. The parties as well as the claims must be properly pended to the federal claim. I shall discuss the question of ancillary jurisdiction later.

**14.** Rule 14(c) reads:
"*Admiralty and Maritime Claims.*
When a plaintiff asserts an admiralty or maritime claim within the meaning of Rule 9(h), the defendant or claimant, as a third-party plaintiff, may bring in a third-party defendant who may be wholly or partly liable, either to the plaintiff or to the third-party plaintiff, by way of remedy over, contribution, or otherwise on account of the same transaction, occurrence, or series of transactions or occurrences. In such a case the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff in the manner provided in Rule 12 and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff."
The Court is of the opinion that Morse's claims against the defendants other than Ta Cheng and Norton Lilly are not cognizable under admiralty jurisdiction. However, the Court could entertain claims against these other defendants by virtue of the doctrines of pendent and ancillary jurisdiction. Rule 14(c) would permit the plaintiff who did not sue directly the third-party defendant to do so, once the third-party defendant was *properly* joined. Rule 14(c) does *not* confer jurisdiction.

tional underpinnings. Rather it reflected a judicial conception of the limited nature of Admiralty Rule 56 and the appropriate reach of the then distinct admiralty jurisdiction."

Judge Friendly concluded that the only possible constitutional consideration which might have influenced the judicial limitation of admiralty impleader was the concern for the denial of the jury trial right guaranteed under the Seventh Amendment. In *Leather's Best*, the court found that it was not confronted with such a possible denial, because the third-party defendant there had made no demand for a jury trial. Likewise, in the case at bar, no demand for a jury trial has been made by any of the parties. Consequently, this Court is also not faced with this constitutional problem.

Defendant Byrnes relies most heavily on the District Court opinion in the *David Crystal* case in support of its position that this Court lacks jurisdiction to entertain the claims asserted against Byrnes.

In *David Crystal, Inc. v. Cunard Steam-Ship Co.*, 223 F.Supp. 273, 290 (S.D.N.Y. 1963), the court found that the acts of the customs broker, even if tortious, did not have their impact on the pier, but in the offices of the customs broker, and thus were not maritime torts. However, the claims against Byrnes do not rest upon an allegation of maritime jurisdiction. Rather, the jurisdictional base is that of pendent and ancillary jurisdiction. The District Court in *David Crystal* likewise rejected pendent claims against the customs broker because it found it necessary to have an independent basis of admiralty jurisdiction to sustain claims against the impleaded party. The District Court's major concern was the deprivation of the right to a jury trial for non-admiralty claims. As *Leather's Best* makes clear, these concerns are moot absent a demand for a jury trial.

In addition, it must be remembered that the District Court opinion in *David Crystal* was written three years before the merger of the Civil and Admiralty Rules, and two years before *United Mine Workers v. Gibbs, supra*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. *Gibbs* liberalized the more restrictive pendent jurisdiction standards articulated in *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). The District Court did not have the benefit of the Supreme Court's new standard in *Gibbs* when it wrote its opinion. Secondly, the court was aware of the limits of the Admiralty Rules and could not have anticipated the application of the concept of pendent jurisdiction to admiralty cases after the merger of the Civil and Admiralty Rules.

Byrnes also fails to mention the fact that on appeal the Second Circuit in *David Crystal* did not have to reach the issue whether the District Court had jurisdiction over the direct claims against the third-party defendants. The court stated that it would " . . . accept without detailed analysis and discussion the authorities that impose jurisdictional obstacles to such direct recovery, . . . *despite our observation that adherence to those precedents often needlessly fragments law suits and might deserve further consideration in the appropriate case.*" (339 F.2d at 300, emphasis added.)

The Second Circuit thus specifically noted the undesirability of the rule and the need to reconsider it when the issue was appropriately raised. *Leather's Best* was the case that occasioned the reconsideration, though it came by way of dictum.

This Court has no doubt that it has the power to exercise pendent jurisdiction over the claims asserted against all the third-party defendants.[15] *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d at 810–811 n. 12.

The Court must consider yet another problem, not addressed by the parties, which is raised by *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). This problem is whether, in light of *Aldinger*, this Court may exercise pendent juris-

---

15. That includes the direct claims of Morse and the cross-claims by the various defendants against one another.

diction over the parties (ancillary jurisdiction). In *Aldinger* the Supreme Court affirmed the Ninth Circuit's finding that pendent jurisdiction was not available to adjudicate State law claims against a county, over which party federal jurisdiction was otherwise nonexistent. The Supreme Court refused to extend pendent jurisdiction to parties where the federal claim was based on civil rights jurisdiction. The *Aldinger* Court did so, based in part on the fact that municipalities, counties, and other governmental units are not persons suable under 42 U.S.C. § 1983. The Court stated (427 U.S. at 17, 96 S.Ct. at 2421):

" . . . Parties such as counties, whom Congress *excluded* from liability in § 1983, and therefore by reference in the grant of jurisdiction under § 1343(3), can argue with a great deal of force that the scope of that 'civil action' over which the district courts have been given statutory jurisdiction should not be so broadly read as to bring them *back* within that power merely because the facts also give rise to an ordinary civil action against them under state law. In short, as against a plaintiff's claim of *additional* power over a 'pendent party,' the reach of the statute conferring jurisdiction should be construed in light of the scope of the cause of action as to which federal judicial power *has* been extended by Congress."

The Supreme Court continued (427 U.S. at 18, 96 S.Ct. at 2422):

"There are, of course, many variations in the language which Congress has employed to confer jurisdiction upon the federal courts, and we decide here only the issue of so-called 'pendent party' jurisdiction with respect to a claim brought under §§ 1343(3) and 1983. Other statutory grants and other alignments of parties and claims might call for a different result. When the grant of jurisdiction to a federal court is exclusive, for example, as in the prosecution of tort claims against the United States under 28 U.S.C. § 1346, the argument of judicial economy and convenience can be coupled with the additional argument that *only* in a federal court may all of the claims be tried

together. As we indicated at the outset of this opinion, the question of pendent-party jurisdiction is 'subtle and complex,' and we believe that it would be as unwise as it would be unnecessary to lay down any sweeping pronouncement upon the existence or exercise of such jurisdiction. Two observations suffice for the disposition of the type of case before us. If the new party sought to be impleaded is not otherwise subject to federal jurisdiction, there is a more serious obstacle to the exercise of pendent jurisdiction than if parties already before the court are required to litigate a state-law claim. Before it can be concluded that such jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence."

This Court is convinced that the prohibition set forth in *Aldinger* should not and would not be extended to admiralty cases of misdelivery. The primary claim arising out of the bill of lading is within exclusive federal admiralty jurisdiction. Clearly, only in a federal court could all of the claims be tried together. There is no indication whatever that Congress implicitly or explicitly has determined that the parties sought to be joined in this action should not be joined. The *Aldinger* requirements for the exercise of ancillary jurisdiction having been met, the Court is free to exercise ancillary as well as pendent jurisdiction in this case.

The Court will exercise its discretion to permit both the pendent and ancillary claims, it being in the interests of judicial economy and fairness, and in order to resolve all matters arising out of the same constitutional case for purposes of Article III. *See, Aldinger v. Howard, supra; United Mine Workers of America v. Gibbs, supra.*

■ Having concluded that this Court has jurisdiction, I shall now proceed to discuss the merits of these motions. The first issue is the extent to which federal legisla-

tion governs the relationship and liabilities of these parties. Two federal statutes have possible impact here. The first is the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1301, *et seq.* COGSA applies only from the time cargo is loaded on board ship until it is discharged from the ship. Because the misdelivery occurred after the cargo was unloaded from the ship, the terms of COGSA do not apply to this case. 46 U.S.C. § 1301(e). *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d at 806; *North American Smelting Co. v. Moller S.S. Co.*, 204 F.2d at 385; *Machado & Co., Inc. v. Flota Mercante Dominicana*, 1970 AMC 1943 (S.D.N.Y.1970). Nor has the bill of lading extended the application of COGSA beyond its statutory reach. Cases which have applied COGSA after discharge of the cargo from the ship have done so pursuant to terms in the bill of lading. *E. g., Royal Typewriter Co. v. M/V Kulmerland*, 346 F.Supp. 1019, 1023 n. 4 (S.D.N.Y.1972), *affirmed*, 483 F.2d 645 (2d Cir. 1973). However, the question whether a term in the bill of lading, invalid under COGSA, springs back to life after discharge from the ship, when COGSA no longer applies, will be addressed later in this opinion.

Similarly, ·the other statute of possible relevance, the Harter Act, 46 U.S.C. § 190, *et seq.*, does not apply here. The Harter Act applies to "the period between the discharge of cargo from the vessel and its proper delivery." *Levatino Co. v. M/S Helvig Torm*, 295 F.Supp. 725, 728 (S.D.N.Y.1968). Proper delivery is defined as the discharge of the cargo to a fit and proper pier, *see, Caterpillar Overseas, S.A. v. S.S. Expeditor*, 318 F.2d 720 (2d Cir.), *cert. denied*, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); *Isthmian S.S. Co. v. California Spray-Chemical Corp.*, 290 F.2d 486 (9th Cir. 1961), *affirmed as modified on rehearing*, 300 F.2d 41 (9th Cir. 1962); *Mamiye Bros. v. Barber S.S. Lines, Inc.*, 241 F.Supp. 99, 105 (S.D.N.Y.1965), *affirmed*, 360 F.2d 774 (2d Cir. 1966), *cert. denied*, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); Gilmore & Black, *The Law of Admiralty* 126 (1957),[16] and possibly notice, *Calcot, Limited v. Isbrandtsen Co.*, 318 F.2d 669, 673 (1st Cir. 1963); *Kinderman & Sons v. Nippon Yusen Kaisha Lines*, 322 F.Supp. 939, 941–942 (E.D.Pa.1971); *Tan Hi v. United States*, 94 F.Supp. 432, 435 (N.D.Cal. 1950).

The Court is convinced that notice sufficient to comport with a logical reading of the Harter Act was given in this case. On March 31, 1973, Morse was notified of the expected time of arrival. On April 1, 1973, the cargo arrived. Byrnes was notified and prepared a delivery order on April 3. It is logical to assume that the thieves obtained the original delivery order on the 3d, or the morning of the 4th, because they showed up at the pier asking for the cargo with the bogus delivery order already in hand on the 4th. If the Court were to read the notice requirement as plaintiff would have it do, then the Harter Act would apply until the plaintiff or its agents came to pick up the cargo. If this were so, then the Harter Act would apply in every misdelivery case, because misdeliveries by definition occur before the rightful owner has had an opportunity to pick up the cargo. Cases such as *David Crystal* clearly demonstrate that such a reading of the notice requirement of the Harter Act is incorrect.

Some of the parties to this action have contended that the Harter Act requires no notice before its terms cease to apply. However, the Court is inclined to adopt those cases such as *Calcot* and *Tan Hi* which have read Harter to·include a reasonable notice requirement. It would seem logical that Congress intended the protections of the Harter Act to cease only after the consignee or his agents have been notified of the discharge of its cargo to a fit and proper pier. The notice given here, though it was of the expected date of arrival, was sufficient to permit Morse to set in motion the steps necessary for pick-up of the cargo,

**16.** *But see, Milikowsky Bros. v. W. F. Kampman's*, 1969 AMC 111, 112 (N.D.Ill.1968), where the court defined delivery as a transfer to the possession of the consignee or his agents.

which Morse did. Byrnes prepared the delivery order and sealed it in an envelope for Interport/Ultimate before the misdelivery. Certainly there was actual notice. Therefore, the Harter Act does not apply. No term of the bill of lading extends the application of the Harter Act beyond its statutory reach.

 It now remains for the Court to consider the terms of the actual contract of carriage, bill of lading. The bill of lading has four clauses of possible relevance here. Those clauses are 1, 2, 9 and 15. Clause 1 reads:

> "(Clause Paramount) This bill of lading shall have effect subject to the provisions of the Chinese Merchant Marine Act of 1929 and any subsequent revised Act if in force, which shall be deemed to be incorporated herein, and nothing here contained shall be deemed to surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under that Act. If any term of this bill of lading be repugnant to that Act to any extent, such term shall be null and void to that extent but no further."

The parties failed, in their pleadings or briefs, to address the possible relevance of Chinese (Nationalist) law, and in particular, the Chinese Merchant Marine Act of 1929, on this issue. The Court specifically requested supplemental briefs on this question. Only the plaintiff and Ta Cheng have submitted anything on this issue. Ta Cheng does not address the issue, but merely asks that it be deferred pending a finding of applicability of the bill of lading.

Clause 2, like clause 1, refers to Chinese law. However, clause 2 requires:

> "Any dispute arising under this bill of lading shall be governed by Chinese law except as may be otherwise provided herein, and any such dispute shall be decided by the Court in China."

Plaintiff's supplemental brief basically argues a waiver position as to both clauses 1 and 2. Ta Cheng has failed to plead or argue the relevance of Chinese law, and has failed to request Chinese venue. It has, consequently, abandoned its rights thereunder.

The Court is unaware of the Chinese law and its possible relevance to the dispute surrounding this misdelivery. Under the "classic view," foreign law had to be specifically pleaded and proved as any other fact. *See,* Weintraub, *Commentary on the Conflict of Laws* (1971) p. 61. Though courts have now regarded foreign law as a question of law, not fact, a usual requirement is that notice be given that it will be relied upon. *Id.* at 61–64. No such notice was given here. In fact, the parties failed to raise the issue. Unlike the famous case of *Walton v. Arabian American Oil Co.*, 233 F.2d 541 (2d Cir.), *cert. denied*, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956), in which failure to plead and prove foreign law, which had to be applied (because the choice-of-law rule was *lex loci delicti* and the place of the wrong was Arabia), resulted in a dismissal, the case at bar can be decided under admiralty and other relevant State laws. In the present case, Chinese law may have no relevance to the issues presented. Consequently, the Court will view clause 1 as having been waived.

Just as parties are free to exercise their own autonomy in selecting law to apply to their contracts, they are free to choose a venue for litigation of their disputes arising out of their contracts, provided the jurisdiction chosen has some relationship to the parties or the contract. *See, The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Central Contracting Co. v. Maryland Cas. Co.*, 367 F.2d 341, 345 (3d Cir. 1966). They are also free to waive it.[17] The parties' failure to raise foreign law by way of pleading or otherwise, even after the Court specifically requested supplemental briefs on the matter,

---

**17.** The Court believes that the holding in *Carbon Black Export v. The S.S. Monrosa*, 254 F.2d 297 (5th Cir. 1958), *appeal dismissed*, 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723 (1959), relied upon by plaintiff for the contrary proposition, has been undermined by the Supreme Court's opinion in *The Bremen*.

indicates a desire to abandon whatever rights or liabilities are created thereunder.

In addition, the Court finds that it would be impractical and unreasonable to adjudicate these matters in Nationalist China. In *Copperweld Steel Co. v. Demag-Mannesmann-Boehler*, 347 F.Supp. 53, 54 (W.D.Pa. 1972), the court determined that even after the *Bremen* case, a forum selection clause in a contract must be read to determine whether the forum selected is a reasonable one. The court concluded that Germany was not a reasonable forum to adjudicate the contract issues in that diversity case because of the "obvious impracticality of conducting the litigation in Germany." I find that this principle is no less compelling in an admiralty case, though I am aware that the *Bremen* case was also one in admiralty.

In light of my disposition of this matter on other grounds, I need not decide whether clause 2 is a mandatory forum selection clause. *See, Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955, 956 (5th Cir. 1974). Consequently, I turn my attention to the remaining relevant clauses in the bill of lading.

■■■ Clause 9 reads in pertinent part: "The carrier shall not be responsible for loss of or damage to, or in connection with, goods arising or resulting from: —

. . . . .

(2) . . . thefts or robberies by any person on board, on craft or ashore whether or not employed by the carrier, . . . ."

Ta Cheng argues that this clause exempts it from liability for the misdelivery here. However, the Court disagrees.

First, the exception for liability found in clause 9 refers to "thefts or robberies," not misdeliveries. The distinction between these terms of art is well known by those in the trade. *Cf. David Crystal, Inc. v. Cunard Steam-Ship Co., supra*, 339 F.2d at 300, where the court noted:

". . . but such disclaimers are not favored by the courts and must be strictly construed. . . . Somewhat similar considerations of strict construction led us to hold that a theft exception in Cunard's [the carrier] bill of lading, also found in the Clark [carrier's stevedore]–Cunard agreement, did not apply to the facts of this case. And because, as between Cunard and Clark, strong policy considerations favor placing responsibility for the misdelivery on Clark, any attempt to escape from that responsibility should be unequivocally expressed."

Similar policy considerations favor strict construction here. If the parties intended to except liability for misdeliveries, they could have specifically done so as they did in clause 15.[18]

■■■ Plaintiff argues that clause 9, which excepts the carrier's negligence from liability, would be void under COGSA. Plaintiff admits that COGSA does not apply after the goods were unloaded from the ship, but argues that once the clause was invalidated under COGSA, it should not be permitted to spring back to life once the goods reach shore. Morse relies on *David Crystal* for this proposition. In that case, the Second Circuit held that a clause in the bill of lading which provided that the carrier's responsibility for the cargo terminated at delivery and that the carrier could abandon the goods on the wharf was void under COGSA. The court added (339 F.2d at 298–299):

". . . It seems to us that once the law declared this clause void, it should remain void forever. It would be unfair to permit the void clause to spring to life once the goods reach land."

*Accord, Leather's Best, Inc. v. Mormaclynx, supra*, 451 F.2d at 816. *See also*, 46 U.S.C. § 1303(8). *Cf. The Ghazee*, 172 F. 368, 370 (2d Cir. 1909); *David Crystal* also makes clear that the parties may contract away or

---

18. Judge Friendly's concurring and dissenting opinion in *David Crystal*, 339 F.2d at 300, *et seq.*, does not even suggest a different result. There Judge Friendly concluded that "errors in delivery" was specific enough a term to express the intent to exempt the carrier from liability for misdeliveries. No such language was employed in the present case.

reduce liability in the bill of lading, but subject to the prohibitions of COGSA and Harter. Thus, though Harter and COGSA standards would not generally apply, they would prohibit inconsistent clauses in bills of lading despite the fact that the cargo was properly unloaded and delivered. Because of the Court's disposition of this matter on other grounds, it need not determine whether the waiver included in clause 9, void under COGSA, would spring back to life once the goods reached land.[19]

The parties are in virtually complete agreement that clause 15 has no relevance to this case. It reads in pertinent part:

"The carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or *misdelivery*, loss of or damage to or in connection with goods carried *on deck* and herein stated as being so carried." (Emphasis added.)

The parties contend that this clause refers specifically to goods carried *on deck*. Plain meaning, the parties argue, indicates that this exemption is restricted to goods carried on deck pursuant to an on-deck bill of lading. The cargo in the present action was carried under the deck and, therefore, clause 15 is inapplicable to the facts in this case. The Court agrees with this reading of clause 15.

The bill of lading, therefore, contains no valid provision exempting the carrier from liability.[20] Consequently, the facts of the present case are quite analogous to those in *David Crystal*, to which I turn for resolution of the issues now before me.

In *David Crystal* the issue was the same as the one presented here: who among the respective parties should bear the loss for misdelivered cargo.[21] The District Court after a trial determined that the plaintiff, David Crystal, Inc. (the buyer and owner), could recover from Cunard (the carrier), who in turn could recover from John T. Clark & Son (the carrier's stevedore). The claims against the buyer's customs broker, Penson & Co., were dismissed for lack of admiralty jurisdiction.[22]

Clark unloaded the cargo of shirts from Cunard's vessel to a pier in Brooklyn, New York, and subsequently misdelivered the cargo "upon the presentation of a forged Penson delivery order, obtained through the complicity of one of Penson's employees." 339 F.2d at 297. After Penson[23] received Cunard's arrival notice, it obtained clearance from customs. It then gave the folder relating to the shipment to its traffic clerk for preparation of the delivery order. The order named Arrow Carriers as the truckman. The order was placed on the outside of a folder and placed on the traffic clerk's desk with other delivery orders in the outgoing mail box.

When the traffic clerk left his desk, an employee of Penson surreptitiously took the

---

**19.** The logic behind this rule articulated in *David Crystal* was (339 F.2d at 299):

" . . . It would be unfair to permit the void clause to spring to life once the goods reached land, for by then Crystal had justifiably relied on the clause's inapplicability in making its decision on adequate cargo insurance."

Judge Mulligan in his dissent in *Leather's Best*, 451 F.2d at 817–818, disagreed with the *David Crystal* rationale on this issue. He claimed that the parties could not be held to have anticipated the court's finding that the limitation of liability was void, and, consequently, the parties would not have relied on its invalidity in allocating the costs of insurance. Because I need not reach this issue, I need not consider which of these rationales is more persuasive.

**20.** The parties have not claimed that clause 13 has any relevance to the case. The facts indicate that the carrier did not store the goods at the risk and expense of the consignee.

**21.** The Court is aware that *David Crystal* is not binding on this Court. However, it has been a widely followed case and is well reasoned. The Court finds it to be very helpful in the resolution of the issues presented in this case because of its great factual similarity.

**22.** This issue was discussed previously in this opinion. The Second Circuit found it unnecessary to reach the issue of jurisdiction.

**23.** Penson was also the consignee of the goods, but that is a fact of no significance in distinguishing *David Crystal*, because the relationship of the parties in *David Crystal* is the same as that in the case at bar.

delivery order and gave it to his confederates. They filled out a blank delivery order conforming it to the original, substituting the name of a fictitious trucker and forging the name of Penson's traffic clerk. This bogus delivery order was presented to Clark's employee, who gave the cargo to the thieves bearing the bogus delivery order. These facts are virtually the same as the facts in the case at bar.

The Circuit Court in *David Crystal* found "that although the bill [of lading] continued to govern the parties' relationships after discharge, its terms did not insulate Cunard from liability." 339 F.2d at 297. The court observed that because the bill of lading did not specify the carrier's obligation once it discharged the cargo to the stevedore, "the law steps in to fill the lacuna; this it does by properly characterizing Cunard's status as a bailee." 339 F.2d at 298. The court continued (339 F.2d at 298):

" . . . And there is no sound reason to alter its bailee status simply because it landed the shirts on Clark's pier. Absent a valid contract to the contrary, a bailee remains liable for the safety of the goods in whatever hands he may place them."

*See also, Taylor v. United States*, 66 F.Supp. 231, 233 (E.D.Pa.1946).

The Second Circuit observed that there was no direct admiralty precedent establishing the standard of responsibility of a bailee who misdelivers cargo. It adopted the rationale of the District Court, which relied on common law and the Uniform Commercial Code in constructing the standard that a bailee is absolutely liable for misdelivering cargo, unless the mistake was induced by the bailor or his agents. The court reasoned (339 F.2d at 298):

" . . . the rule of absolute liability represents a sound allocation of responsi-

bility for the bailee is in a better position than the bailor to establish procedures to minimize the risk of misdeliveries and to insure against the few misdeliveries that will inevitably occur despite the most careful precautions." [24]

The court found in *David Crystal*, as I have here, that there was no valid term in the bill of lading which eliminated or reduced this liability.

The court then proceeded to discuss whether the customs broker's negligence worked an estoppel against the plaintiff's recovery from the carrier. The *David Crystal* court, in reliance on a case from our own Circuit, *MacAndrews & Forbes Co. v. United States*, 23 F.2d 667 (3d Cir. 1928), noted (339 F.2d at 299): "The law is clear that if Penson's negligence caused the misdelivery, Crystal would be barred from recovery." This doctrine is known as "estoppel by negligence." *See*, District Court opinion in *David Crystal, supra*, 223 F.Supp. at 286.

The court in *David Crystal* refused to upset the District Court's finding that the customs broker could not be faulted for its office procedures or for hiring and retaining the man, Segarra, who stole the delivery order and forged the order used to obtain the misdelivered goods. The court found that Segarra had not acted within the scope of his authority when he took the valid delivery order. He was permitted, however, to exercise temporary control over such orders with respect to answering inquiries, but he was not authorized to give them to truckmen. Nor did he have authority to complete blank forms. He was a mere custodian of the forms, and his forgery of the forms was not binding on his principal, Penson.

The Second Circuit found "that by trusting Segarra to this limited extent Penson may have facilitated the plot, [but] we are

---

**24.** This proposition is well accepted.

" . . . It is uniformly held that a delivery of bailed property by the bailee to one not the true owner and not authorized by the bailor to receive it is, of itself, a conversion, and a breach of the contract of bailment for which the law imposes an absolute liability upon the bailee for loss or damages occa-

sioned thereby, irrespective of the fact that he may have acted in good faith and without negligence, and even though the misdelivery was the result of innocent mistake or was induced by fraud or trick."
8 *Am.Jur.2d, Bailments*, § 167. *See also*, discussion *supra*, pp. 481–482.

unwilling to stretch the tenuous line of causation and say that Penson 'proximately caused' the misdelivery." 339 F.2d at 299. The court concluded that Penson's negligence, if any, was not the proximate cause of the misdelivery. Consequently, the carrier's liability was not negated by the bailor's agent's negligence.

It is important at this point to note that the findings with respect to Penson's negligence and proximate cause were questions of fact before the District Court. In the case at bar, Ta Cheng and Maher argue that as a matter of law Byrnes was negligent. They claim that it was negligent for Byrnes to leave blank delivery orders in its warehouse and in the unlocked desk of one of its employees. These delivery orders were unnumbered and unstamped. There is no system employed to account for destroyed, lost, or discarded delivery order forms. The facts seem to indicate that there is easy access to these orders. At lunch time, the office is left unlocked, but someone remains there to have lunch in the office.

The prepared delivery order is placed in an envelope addressed to the designated truckman, but is left in an open outgoing-mail box on a desk in the office. There is open access to that desk. Often the truckman picking up the envelopes containing the orders is not required to present identification. Byrnes claims that is because the truckman's runners are usually well known to its employees. No receipt is required when the delivery orders are picked up. However, Byrnes claims to have a log. There is a factual dispute over whether Interport/Ultimate's messenger, Jack Schwartz, was required to sign for the orders he picked up on April 3. Byrnes claims to have placed the original Morse order for the 466 cartons of tape-players in the envelope which Interport/Ultimate picked up. However, Interport/Ultimate claims not to have received it.

Whether or not these procedures are negligent is a question of fact to be determined by the trier of fact after a plenary hearing. It may be that the procedures employed by Byrnes were reasonable and met the applicable standard of care.[25] Clearly, similar facts gave rise to some skepticism by the District Court in *David Crystal* with respect to Penson's negligence. 223 F.Supp. at 287-288.

However, unlike *David Crystal*, there is no allegation that one of the customs broker's employees, who would have easy access to the delivery orders, was responsible for the theft. Consequently, the question of office security may indeed be relevant to the question of negligence.

It is apparent that whether Byrnes was negligent can only be determined at trial. However, Byrnes and Morse argue that they are entitled to summary judgment relieving Byrnes of liability based on the proposition that even if Byrnes were negligent, its negligence was not the proximate cause of the misdelivery. Byrnes relies on *David Crystal* for that proposition. 223 F.Supp. 273, 287-288, *affirmed*, 339 F.2d 295, 299.

The District Court in *David Crystal* stated (223 F.Supp. at 288):

"Furthermore, the document which Segarra abstracted was not the one used to obtain delivery. It is unquestioned that Clark made delivery on a forged order. The blank which Segarra also abstracted was, beyond doubt, an incomplete instrument. Only the intervening criminality of the co-conspirators gave some life, albeit abortive, to the document."

The court thus interpreted the forged delivery order as an intervening and supervening criminal act which prevented Penson's negligence, if any, from being the proximate cause of the misdelivery, despite the

---

25. The question as to what standard of care should be employed was not reached in *David Crystal.* This Court would need to consider it at trial. It would seem that Byrnes' standard of care would be defined under State law. Though this case is not a diversity action, it would still seem that the federal court would apply the choice-of-law principles of the forum in which it sits. *Cf. Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

intentional acts of one of Penson's employees.

The case *sub judice* presents a factually distinguishable situation. I will not adopt per se the rationale of *David Crystal* on this point and apply it to facts which, in my opinion, might not have given rise to that rationale. I believe that only after a trial on this issue could I determine whether Byrnes' negligence, if any, was *in fact* the proximate cause of the misdelivery.

In *David Crystal* the District Court concluded that its case was factually distinguishable from *MacAndrews & Forbes Co. v. United States, supra,* 23 F.2d 667. This Court believes that the present case is factually closer to *MacAndrews* than it is to *David Crystal* on the question of proximate cause.

In *MacAndrews* the plaintiff's carrier, the United States, was to deliver a cargo of fox skins. Plaintiff's customs house broker designated Cantwell and Wall as truckmen to receive and deliver the goods. The letter, which was in essence a delivery order, was delivered to the office of the trucking firm. The truckman took the delivery order to a public garage where its trucks were kept. As was its practice, the order was placed in the desk drawer of the office of the garage, where its truckmen would go to find it. Obviously, the court concluded, the order was removed from the unlocked drawer by someone other than Cantwell and Wall's truckman. The following morning the order was used to obtain the cargo.

The court said (23 F.2d at 667):

"Where, as here, a fraud has been committed by a third party, and the loss must fall on one of two innocent parties, the law lets it rest on the one whose act made possible the perpetration of the fraud."

The court concluded (23 F.2d at 667):

" . . . In that regard we are clear, as was the court below, that *the fraud was made possible by those acting for the plaintiffs.* The ship brokers were entitled to receive the shipment, and, had they applied to the delivery clerk, they would have received it. Instead of so doing, they signed a written order direct-ing delivery to their trucking firm; but the order for this valuable shipment, instead of being delivered by that firm to its truckman, was left in an unlocked drawer in a public garage, where it was evidently found and abstracted by some person, who was thus by the lack of care of the plaintiff's agent—and lack of due care is negligence—put in a position to wrongfully obtain the goods." (Emphasis added.)

The delivery order was all that was required to obtain the goods. The court found that it clothed the bearer with authority to take the cargo. The court thus found that the plaintiff's agent's negligence was the proximate cause of the misdelivery. But for plaintiff's agent's negligence in leaving the delivery order in a place where it could be stolen, the misdelivery could not have occurred. The conclusion was that this negligence estopped the plaintiff from recovery.

The case at bar is closer to *MacAndrews,* where the negligence of the plaintiff's agent might well have been the proximate cause of the misdelivery. *David Crystal* involved a claim of negligence against Penson based on the complicity of one of its employees in the theft of the original delivery order. Thus the court had to confront the question whether the employee acted within the scope of his authority. In both *MacAndrews* and the case at bar there is no allegation that an employee of the customs broker was involved in the theft of the original delivery order and the blank delivery order used to obtain Morse's cargo. I conclude, therefore, that the question of proximate cause is one of fact to be resolved at trial.

█ If after trial it is determined (1) that Byrnes was negligent, and (2) that its negligence was the proximate cause of the misdelivery, then Byrnes' negligence would be an absolute bar to Morse's recovery against Ta Cheng and Maher. *See, David Crystal, Inc. v. Cunard Steam-Ship Co., supra; MacAndrews & Forbes Co. v. United States, supra.* If such a finding is made,

then Morse could recover on its claim against Byrnes for breach of its duty to Morse. Consequently, Morse's motion for summary judgment against Ta Cheng must be denied as there exists a genuine issue of material fact as to whether Byrnes' negligence works an estoppel against Morse's recovery against Ta Cheng. *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir.), *cert. denied*, 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969). I must for the same reasons deny Ta Cheng's cross-motion to dismiss the complaint. Likewise Byrnes' motion for summary judgment against Morse must be denied.

I now turn to Ta Cheng's summary judgment motion against Maher. Ta Cheng argues that if it is held to be liable to Morse for the misdelivery, then Ta Cheng is entitled to recover against Maher for breach of an implied warranty of workmanlike service. This theory was recognized in *David Crystal*, where the court ruled that the ultimate loss would fall upon the stevedore (terminal operator).

In *David Crystal* the Second Circuit noted (339 F.2d at 299):

" . . . The Supreme Court recently indicated, in *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), that the implied warranty may be breached even where, as here, there has been no showing of negligence on the stevedore's part. Surely, Clark [the stevedore] was in a far better position to prevent the misdelivery than Cunard [the carrier] and liability should properly fall upon the party who is best situated to adopt protective measures."

Thus, it would seem that under the authority of *David Crystal*, absent even negligence of the stevedore,[26] liability is imposed on it because it is in a better position to prevent misdelivery than is the carrier, who has usually ceased to exercise control over the cargo once it is in the hands of the stevedore. Consequently, *if* it is found that Ta Cheng is absolutely liable, fairness and logic dictate, and precedent suggests, that the ultimate loss should be carried by Maher, the party who could best sustain it.

Neither Ta Cheng nor its agent, Norton Lilly, maintained any control over the cargo once it was delivered to Maher. None of Ta Cheng or Norton Lilly's agents were present at the pier. Maher had complete responsibility. It hired the workers to care for the cargo. It did the stevedoring. It hired Sullivan Security Service to safeguard the pier.[27] It actually gave the cargo to the thieves bearing the bogus delivery order.

Nor does *MacAndrews* suggest a different result here. In *MacAndrews* the court refused to impose liability on the party who actually misdelivered the goods on the basis of the stolen delivery order. But the court refused to impose liability on that party because of the plaintiff's agent's own negligence. What *David Crystal* suggests is that *only* if the plaintiff's agent is not negligent, or his negligence is not the proximate cause for the loss, then as between the carrier and stevedore, the loss should fall on the latter. If, however, Byrnes' negligence does bar Morse's recovery from Ta Cheng, then the Court would not need to consider the question of any breach of duty to Ta Cheng by Maher. Nor would Maher be

---

26. Maher claims that it was not negligent. It employed the same procedures for clerking vessels in Ta Cheng's case as it did in others. Maher photographs the truckman and his license and checks the credit of the trucking firm. The procedures employed, according to Maher, were set up by Norton Lilly, Ta Cheng's agent, who inspected the facilities and approved of them shortly before the misdelivery. Maher also claims that it was never supplied with a list from Byrnes of persons authorized to sign delivery orders. (See Hughes deposition 75.) Byrnes claims that Maher should have realized the order was incorrect because the truckman was different from the one Morse always uses and because the customs identification number did not appear in the upper right-hand corner. However, on the authority of *MacAndrews* these allegations of negligence and Maher's defenses thereto may be irrelevant.

27. These motions for summary judgment do not require the Court to consider Maher's claims against Sullivan Security Service in the event it is held ultimately liable.

liable directly to Morse, because the loss would be borne by Byrnes.

■ If Byrnes' negligence is the proximate cause for the misdelivery, then the Court would need to consider whether Maher might be jointly liable, assuming its negligence were also considered as a proximate cause of the misdelivery. *MacAndrews* suggests that no joint liability on the part of Maher could be maintained. As the court in *MacAndrews* observed (23 F.2d at 668):

" . . . Manifestly, in the press and course of the delivery of goods at a wharf, it was not the duty of the delivery clerk [stevedore-terminal operator], when the signed order was presented to him, to refuse delivery until he had ascertained whether the truck and the truckman were authorized to receive the packages. To place on a delivery clerk [stevedore-terminal operator], when a truckman presented a bona fide order calling for delivery of goods, the duty of dropping his work and further satisfying himself of the agency of a truckman presenting such valid order, would be impracticable. The negligence of the plaintiff had clothed the truckman with such semblance of authenticity that the delivery clerk [stevedore-terminal operator] was justified in assuming the status of the truckman was that of an authorized holder of the delivery order."

*MacAndrews* suggests that the stevedore-terminal operator would not be liable despite its failure to investigate further the identity of the bearer of the delivery order. The only distinguishing factor is that in the case at bar a bogus delivery order as opposed to the original was employed. Only if it were found that Maher was negligent in not realizing that the order was bogus

might it, along with Byrnes, be jointly liable.[28] *Cf. Union Marine & General Ins. Co. v. American Export Lines, Inc.*, 274 F.Supp. 123 (S.D.N.Y.1966). The language in *MacAndrews* might still suggest that Maher should not be held liable for failure to scrutinize the delivery order. In any event, this result is not possible, because Byrnes' negligence, if the proximate cause of the misdelivery would be a total bar to recovery against the carrier. Consequently, Maher could not be held jointly liable.[29] Again because Ta Cheng's motion for summary judgment against Maher depends on the fact questions raised by Morse's summary judgment motion, it must also be denied.[30]

■ The Court now will turn its attention to the last summary judgment motion, that of Interport/Ultimate against Maher and Byrnes. The truckman claims that because the delivery order used to obtain the cargo was not the original delivery order, which it denies even receiving, it cannot be held liable to anyone for the misdelivery. There is an issue of fact as to whether the truckman actually received the delivery order. Byrnes' employees say Interport/Ultimate did receive it, and the latter says it did not. Assuming, *arguendo*, that it did, it is true that the original delivery order was not presented by the thieves to Maher employees when the cargo was misdelivered.

However, if it is proved that Interport/Ultimate did in fact receive the original order, and it can be shown that through its negligence the order fell into the hands of the thieves, then it, along with Byrnes, could be liable for their negligence in permitting the thieves to obtain the orders. This, of course, would only subject Interport/Ultimate to liability in the event its

**28.** This could conceivably be held to be a failure to perform services in a workmanlike manner and a breach of its duty owed to the carrier. *See, Cameco, Inc. v. S. S. American Legion*, 514 F.2d 1291 (2d Cir. 1974).

**29.** The Court, therefore, need not consider the same issue raised by Ta Cheng in its discussion of *Vana Trading Co., Inc. v. S. S. Mette Skou*,

415 F.Supp. 884 (1976), *reversed*, 556 F.2d 100 (2d Cir. 1977). Other questions of liability between respective parties need not be reached at this time.

**30.** The issue of attorneys' fees incurred by Ta Cheng in defense of Maher need not be reached at this time either.

negligence was the proximate cause of the misdelivery.[31] The blank delivery order would still have to have been secured from Byrnes; thus, joint liability.

At this point, it seems that Byrnes could not show that the original order was stolen from Interport/Ultimate rather than from its own office. However, this is a fact to be decided at trial.

If, however, the Court is presented with a factual situation such that it must consider joint liability,[32] then conceivably Interport/Ultimate may be held liable to Morse along with Byrnes. Maher claims that if it is held liable to Ta Cheng, it might be able to recover from Interport/Ultimate. However, even if the Court distinguishes the *MacAndrews* case and holds that Maher was negligent in accepting for delivery a bogus delivery order, and holds that Interport/Ultimate was liable to it for its negligence in permitting the original order to get into the hands of the thieves, Byrnes would have to be jointly liable to Maher for permitting the blank order to be taken. However, Byrnes' negligence, if then a proximate cause of the misdelivery, would completely bar recovery by the plaintiff. Consequently, Maher would itself not be liable. This rather complex circle leaves this Court with the conclusion that there remains no theory upon which Maher could maintain a claim against Interport/Ultimate. Likewise, the Court can find no theory upon which Byrnes could maintain a claim against Interport/Ultimate. Therefore, Interport/Ultimate's motion for summary judgment against Maher and Byrnes will be granted. All other motions for summary judgment are denied.[33]

Counsel shall submit an order in conformity with this opinion.

**31.** Byrnes claims that the procedures it followed with respect to delivery orders were set up by Interport in 1972, and subsequently approved by it. (Firrielo affidavit, ¶ 7.)

**32.** No *res ipsa loquitur* claim has been made with respect to negligence between Maher and Byrnes.

**33.** Consequently all parties remain in the case.

Interport/Ultimate's summary judgment motion will be granted in the alternative as a motion to dismiss under Fed.R.Civ.P. 12(b)(6).